**ROYCE et al. v. SQUIRE, Collector of Internal Revenue.**

**Civil Action No. 876.**

District Court, W. D. Washington, S. D.
June 16, 1947.

Randall S. Jones and Robert T. Jacob, both of Portland, Or., for plaintiffs.

J. Charles Dennis, U. S. Atty., and Harry Sager, Asst. U. S. Atty., both of Tacoma, Wash., and Thomas R. Winter, Sp. Asst. to Chief Counsel, Bureau of Internal Revenue, of Seattle Wash., for defendant.

LEAVY, District Judge.

The above-entitled cause came on regularly for trial on the 1st day of May, 1947, before the above-entitled Court, and the Court having signed and entered an order on the pre-trial hearing and witnesses having been sworn and having testified, exhibits introduced in evidence, oral argument by counsel, and the Court having rendered an oral opinion and the Court being fully advised, now makes the following:

Findings of Fact

I. At all times herein mentioned, plaintiff, E. Royce, was, and still is, a resident of Portland, Multnomah County, Oregon; plaintiff, B. Royce, was, and still is, a resident of Vancouver, Clark County, Washington, and plaintiff, A. H. Wenck, was, and still is, a resident of Seattle, King County, Washington, and plaintiffs were, and still are, engaged in the business of

transporting passengers in motor vehicles, under the firm name and style of "Gray Line Tours", having its principal place of business in Seattle, Washington.

II. At all times herein mentioned, defendant was, and now is, United States Collector of Internal Revenue for the District of Washington, stationed at Tacoma, Washington.

III. Jurisdiction of the within cause rests upon the Internal Revenue Code of the United States, Section 3469, as amended by the Revenue Act of 1943, § 302, Subdivision (a), 26 U.S.C.A. Int.Rev.Code, §§ 3469, 1650, and the provisions of Section 322.

IV. Plaintiffs, on February 28, 1942, filed with the defendant delinquent returns on tax for transportation of persons for the months of October, November and December, 1941, and timely returns for the period January 1, 1942, through September 30, 1944, and paid the sums as taxes, penalties and interest in the amount of $16,423.-51.

V. On the 30th day of November, 1944, plaintiffs filed and lodged with the defendant herein a claim on proper form in such cases provided for the refund of said $16,-423.51, together with interest as provided by law.

VI. On the 19th day of June, 1945, the Commissioner of Internal Revenue rejected said claim for refund.

VII. Plaintiffs and their predecessor corporation have engaged in such business since April, 1934. Their principal activity in the field of local transportation since May 1, 1941, has consisted of transportation of persons. Plaintiffs' predecessor corporation, about that time, entered into a written contract or agreement, dated May 7, 1941, with the United Air Lines Transport Corporation to provide transportation service for passengers of said United Air Lines to and from the airport at Boeing Field, Seattle, Washington. Oral agreements or similar arrangements were later made with the Northwest Airlines and Pan-American World Airways. There were no subsequent or other written agreements between the plaintiffs and the airlines; and the transportation service has continued to be operated in substantially the same manner during all the period involved.

VIII. Plaintiffs' limousine fleet until January 6, 1945, consisted of five seven-passenger limousines. On that date an eleven-passenger limousine was added to the fleet, and it has been operated in the same manner as the seven-passenger limousines. Plaintiffs operated five other seven-passenger limousines for their funeral service and also a twenty-passenger bus was used in charter service to the air lines for out-of-town service only. No taxes for transportation on the eleven-passenger limousine, the limousines when used for funeral service nor the twenty-passenger bus are involved in this action. If needed, however, the cars used for funeral service were operated on the air line service and taxi cabs were hired to handle the overflow on the air line service.

IX. Four of the limousines customarily used in the regular air-line service were painted gray and one was painted black. On most limousines during most of the period involved, there were placed painted detachable emblems of the air line companies which were twelve inches square or round and were placed on the right front door of the limousines. These were changed on the particular limousine used showing the particular air line whose passengers were being transported to or from a scheduled air-line flight. For sometime, signs have been painted on the limousines, rectangular in shape, bearing the words "Air Line Service" and underneath in smaller letters the words "Gray Line Tours".

X. The air line companies did not sell or issue tickets in connection with flight passage that were good for transportation to or from airports in the plaintiffs' limousines; however, they published schedules of fares of the limousine service.

XI. Air line passengers, when purchasing ticket for a scheduled flight, were asked by employees of the air lines whether they desired limousine service or whether they would use their own transportation. In cases where air line passengers desired such limousine service they were advised of the places of departure of passengers which

were usually the offices of the air line companies, the Olympic Hotel, the New Washington Hotel and/or one or more hotels designated at the time. They were also advised of the time of the departure of the limousines from those places, which was approximately one hour prior to the air line flight. Also, approximately an hour before the plane was scheduled to leave the airport, the air line office would notify the plaintiffs' dispatcher when the flight was leaving, names of the passengers who were scheduled to use the limousine service and the places from which they were scheduled to depart. Prior to the arrival of an incoming flight, the air lines would notify the plaintiffs' dispatcher of the time of the plane's arrival. The plaintiffs would then send a limousine to the airport to transport any passengers desiring limousine service to the said metropolitan area. In case of emergency, adverse weather conditions or when Boeing Field was unavailable, plaintiffs would dispatch a bus or limousine to or from other fields, and such service was billed to the air line, the tax liability on which transportation is not herein involved.

XII. No air line passengers were picked up in the down town district, except at points designated by the air lines and pursuant to a telephone call from the air lines. The said down town district was considered by the plaintiffs and the air lines to be that area in the City of Seattle bounded on the North by Lenora Street, on the East by Ninth Avenue, on the South by Boeing Field, and on the West by the waterfront of Puget Sound. The plaintiffs' drivers were instructed to follow the most direct route between Boeing Field and the said down town district, but they were free to, and did, select the streets over which they travelled, and they usually used Southwest Fourth Avenue or Airport Way when going to and from Boeing Field, as the trip over either street is of equal distance, but in cases of traffic congestion or when streets were undergoing repairs, the drivers themselves selected other streets upon which to travel. In returning to the business district from said Field, Southeast Ninth Avenue was used from time to time by some drivers.

XIII. Approximately 50 per cent of the air line passengers used limousine service and from 10 per cent to 15 per cent of all flights were postponed by the air lines due to weather conditions. About 5 per cent of the flights were to and from fields other than Boeing Field due to weather conditions, and Boeing Field during the war period was temporarily closed to civilian use. In cases of such emergencies, the plaintiffs carried air line passengers by means of said limousines or other motor vehicles to Paine Field or the Seattle-Tacoma Airport, distances of approximately 30 and 11 miles, respectively, from said down town district of Seattle, and when limousines were being operated by plaintiffs to or from either Paine Field or the Seattle-Tacoma Airport, no limousines were operated between said Boeing Airport and said down town district of Seattle. No taxes for transportation on the limousines or other motor vehicles used in the transportation of persons to or from Paine Field and Seattle-Tacoma Airport are involved in this action.

XIV. Under the agreement and/or arrangements with the air lines, the plaintiffs were required to meet all incoming scheduled plane flights and frequently limousines were sent out to the airport, without passengers, to meet an incoming plane. If there were no incoming air line passengers using the limousine transportation back to the metropolitan area, the limousine might wait at the airport until the arrival of the next scheduled flight or be ordered back to town by plaintiffs' dispatcher. It was sometimes necessary to order limousines back from an airport to the metropolitan area in order to transport passengers from the metropolitan area to a scheduled outgoing flight.

XV. Plaintiffs' limousines never accepted passengers without being called by the air lines' office and being told whom the passengers were and the time and places where passengers were to meet the limousine for departure. The City of Seattle maintains a city street bus line running from its metropolitan area to the Boeing Airport under the management of the Seattle Transit Commission, a Commission

consisting of three people appointed by the Mayor of said City, and this city street bus line operates on an established time schedule over the city streets on a fixed route.

XVI. All of said vehicles, including the said eleven-passenger limousine, are licensed as "for hire" vehicles under the laws of the State of Washington, as defined in Section 6312—1, et seq., Remington's Revised Statutes of Washington, and operate as "for hire" vehicles in the City of Seattle under Ordinance No. 59866.

XVII. Prior to October 10, 1941, the plaintiffs' established one-way fare was $.75 between the designated places of departure in the metropolitan area and the Boeing Airport, and the same one-way fare was charged between the airport and the metropolitan area. On October 10, 1941, the plaintiffs started collecting $.80 per passenger. Section 3469 of the Internal Revenue Code, as amended by Section 554 of the Revenue Act of 1941, imposing a transportation tax of 5 per cent, became effective on said date. The plaintiffs, starting November 1, 1942, through November 21, 1942, collected $.84 per passenger. The tax rate was increased by Section 609 of the Revenue Act of 1942 to 10 per cent, effective on said November 1, 1942, 26 U.S. C.A. Int.Rev. Code, § 3469. On November 22, 1942, plaintiffs started collecting $.85 per passenger until April 1, 1944, and on and after said date began collecting $.90 per passenger. Section 302(a) of the Revenue Act of 1943, 26 U.S.C.A. Int.Rev. Acts, page 470, became effective on said April 1, 1944, and it increased the rate to 15 per cent. From October 10, 1941, to April 1, 1944, the air lines were billed by plaintiffs for $.75 per passenger carried at the air lines' expense, plus 5 per cent or 10 per cent of the amount billed as a tax, depending upon the tax rate then in effect. On and after April 1, 1944, the air lines were billed by the plaintiffs for $.78 per passenger carried at the air lines' expense, plus 15 per cent of the amount billed as a transportation tax.

XVIII. Plaintiffs furnished their drivers with new schedules of airport fares upon the effective date of each increase mentioned in paragraph XVII. The drivers would collect the fares existing at the time for the transportation from the passengers carried, except passengers carried at the expense of the air lines, and in cases where a passenger would ask what the fare included, a driver himself would tell the passenger it included the tax.

XIX. Plaintiffs' drivers turned in the cash collected with their "daily turn-in sheets" to their dispatchers who checked them and prepared a daily operating report, summarizing cash fares, tax, charge fares and tax. Plaintiffs' bookkeeper prepared "monthly summary of daily operating reports." The cash fares and tax were then entered in the plaintiffs' cash journal. Exhibit A–12 is the cash journal sheet of plaintiffs for October, 1941. The cash fares and tax were maintained as separate items and the amounts reported in the tax returns filed are the sums of the monthly total collected as taxes on cash fares and the monthly total billed to and collected from the air lines as taxes. The amounts collected as taxes in the cash journal were posted monthly to an account in the plaintiffs' general ledger entitled "Federal Transportation Tax," Account No. 2020E. The taxes are shown on the plaintiffs' books as an accrued liability account and the taxes collected, as aforesaid, have not been closed into the plaintiffs' profit and loss account nor reported in its income tax liability during any of the period involved.

XX. All sums collected from the individual passengers and from the air lines, including the amounts billed and collected as tax, were deposited in the plaintiffs' bank account and the sums paid by plaintiffs to the defendant, as shown by said returns, were paid by checks drawn by plaintiffs on their said bank account.

From the foregoing Findings of Fact, the Court makes the following

### Conclusions of Law

I. That during the period October 10, 1941, through September 30, 1944, the plaintiffs, in transporting passengers in their motor vehicles involved in this action, were operating their said vehicles "on an established line" within the meaning of Section

3469 of the Internal Revenue Code, 26 U.S. C.A. Int.Rev.Code, § 3469, and the Regulations promulgated thereunder.

II. That the taxes assessed and collected were in all respects legal and in strict accordance with the law.

III. The judgment should be entered dismissing plaintiffs' complaint, with costs to the defendant to be taxed by the Court.