The **GRAY LINE COMPANY**, a corporation, Appellant,

v.

**R. C. GRANQUIST,** District Director of Internal Revenue, Appellee.

No. 14978.

United States Court of Appeals Ninth Circuit.

Oct. 12, 1956.

Rehearing Denied Nov. 20, 1956.

Jacob, Jones & Brown, Randall S. Jones, Morris J. Galen, Portland, Or., for appellant.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, A. F. Prescott, Karl Schmeidler, Attys., Dept. of Justice, Washington, D. C., C. E. Luckey, U. S. Atty., Victor

E. Harr, Asst. U. S. Atty., Portland, Or., for appellee.

Before HEALY, POPE and LEMMON, Circuit Judges.

LEMMON, Circuit Judge.

Appellant corporation sued in the court below to recover taxes, penalties and interest paid appellee assessed under Section 3469 of the Internal Revenue Code of 1939, Title 26 United States Code. The suit followed a denial by appellee of appellant's claim for refund provided by Title 28 U.S.C. § 2411.

During the month involved here, July, 1950, appellant was engaged in the business of "transportation, sightseeing and airport transportation" for hire. One of its activities during that month consisted of the operation of a limousine service for airline passengers alighting from or boarding planes of the Northwest Airlines, Western Airlines and Pan American World Airways between the airports and the downtown area of Portland, Oregon. For the purpose of this discussion we are assuming that only seven-passenger limousines were used. Except on one occasion, mentioned hereafter, on none of the trips were more than seven passengers carried. When not in use the limousines were kept in appellant's garage in Portland.

Under a contract between it and Northwest Airlines, appellant agreed to provide transportation by limousines for Northwest's passengers to and from Portland Airport and the City of Portland, and whenever Northwest's regularly scheduled flights originated or terminated at Troutdale Field, to provide such service between Troutdale and the City of Portland. Similar service was provided by appellant for passengers and employees of Western Airlines and Pan American World Airways.

The airline companies did not sell or issue tickets that included transportation to or from the airports on appellant's limousines. Their published schedules did not specify times for limousine service. Customarily, airline passengers on purchasing tickets for scheduled flights were asked by employees of the airlines whether they desired limousine service. When passengers desired such service arrangements were made as to where they would be picked up, usually at the offices of the airline or at a hotel, usually the Old Heathman, Multnomah or Benson. Passengers were also advised when and where in the downtown area the limousine would depart. The airline companies established the "pickup" points at places convenient to the passengers. Appellant did not pick up passengers other than at designated points, or along the route followed between the designated points or between the downtown area and the airports. Passengers from the airports were delivered at any place other than those designated in the downtown area if they were in the general direction of the designated points, or at any place on the east side of Portland along the route taken.

Appellant did not have a dispatcher, and during the month in question employed four regular drivers and an extra driver. They worked in shifts and took turns in transporting passengers. The driver whose turn it was to make the next trip would telephone the airline company to ascertain the names of the passengers he was to take to the airports, the places where they were to be picked up, and the departure time of the airplane. He would then pick up the passengers at the places so designated and drive them to the airports. After unloading them he would ascertain from the airline when the next plane was to arrive, and, if the arrival time was within a reasonable interval and there were passengers aboard the plane who desired or might desire transportation from the airports to the city, he would wait until the plane arrived and was unloaded. If it appeared that no plane was due to arrive within a reasonable time carrying passengers who desired or might desire limousine service, he would return directly to appellant's garage.

If there was no limousine at the airport to meet an incoming plane and no limousine was to arrive with passengers

in time to meet the incoming plane, appellant would send a limousine to meet the incoming plane, provided there were passengers thereon who desired or might desire limousine service. As a result, sometimes airplanes would arrive or leave the airports without limousines making any trips to the airports. The Portland Airport is approximately ten miles from downtown Portland. About eight hundred trips were made during July, 1950.

Appellant did not instruct its drivers as to the particular route to be traveled, but they always traveled in the general direction between the airports and downtown Portland. Weather and traffic conditions were factors which the drivers considered in selecting the streets over which they traveled. Appellant did not post or print any schedules of its service and no public authority specified the route to be followed. The evidence further disclosed that approximately twenty-five percent of airline passengers used limousine service and that about ten percent of all flights were postponed by the airlines because of weather conditions.

Appellant's one-way charge for transportation to or from the airport was increased from eighty-five cents to one dollar for airline passengers by agreement with Northwest. The price charged by appellant in July, 1950, was one dollar for passengers and sixty cents for air-

line company employees. Limousine drivers collected these amounts from those using the service, except that charges for trips of airline crews based in cities other than Portland were billed to the airlines monthly. The drivers made a waybill for each trip or round trip and turned these in daily to appellant, together with the cash collected by them.

The Deputy Commissioner of Internal Revenue, by letter dated June 30, 1948, advised appellant that it was subject to the transportation tax.

The trial court found that the fares collected included the transportation tax; that the transportation tax was included in the charge made by appellant to its passengers and employees during the month of July, 1950; and that the burden of the tax was not borne by appellant. The books and records of appellant did not reflect the collection of the transportation tax from passengers as a tax obligation, although it did carry on its books and records an account showing tax liability for other transportation furnished by it.

The District Court found that the amounts assessed as penalty under Section 1718(c) of the Internal Revenue Code of 1939 and paid by appellant were not collected from its passengers.

The pertinent code sections [1] and

---

1. "§ 1718. **Penalties**

\* \* \* \* \*

"(c) Any person who willfully fails to pay, collect, or truthfully account for and pay over, any tax imposed by this chapter, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty of the amount of the tax evaded, or not paid, collected, or accounted for and paid over, to be assessed and collected in the same manner as taxes are assessed and collected. No penalty shall be assessed under this subsection for any offense for which a penalty may be assessed under authority of section 3612. \* \* \*" 26 U.S.C. 1952 ed., § 1718.

Chapter 30—Transportation and Communication

**Subchapter C—Transportation of Persons**

"Sec. 3469 [As added by Sec. 554(b), Revenue Act of 1941, c. 412, 55 Stat. 687] **Tax on transportation of persons, etc.**

"(a) **Transportation.**—There shall be imposed upon the amount paid within the United States, on or after October 10, 1941, for the transportation, on or after such effective date, of persons by rail, motor vehicle, water, or air, within or without the United States a tax equal to 15\* per centum of the amount so paid. Such tax shall apply to transportation by motor vehicles having a passenger seating capacity of less than ten adult passengers, including the driver, only when such vehicle is operated on an established line."

\* The rate was increased to 15 per centum by Section 302, Revenue Act of 1943, c. 63, 58 Stat. 21. 26 U.S.C. 1952 ed., § 3469.

" § 3471 [As amended by Sec. 554 (d) (2) of the Revenue Act of 1941, su-

Treasury Regulations [2] are set forth in the margin.

■ The first point strenuously urged by appellant is that the court below erred in concluding that appellant's limousines were operated on an "established line". Vehicles, having a seating capacity of less than ten adult persons, come under the taxing statute only if the vehicles are "operated on an established line". Section 130.58 of the Regulations defining that term states that "operated on an established line" means operated with some degree of regularity between *definite points*. It does not necessarily mean that strict regularity of schedule be maintained." [Emphasis supplied.] That the airports were definite points must be conceded; but appellant argues that there was no definite point in downtown Portland. It is to be noted, however, that the definition does not state "two definite points" but rather "definite points". The garage and the three hotels are definite points.

We conclude that the situation here presented comes within the definition. The facts here are essentially similar to those in Royce v. Squire, D.C.W.D.Wash., 73 F.Supp. 510, 513, affirmed on other grounds 9 Cir., 168 F.2d 250, where the court concluded that the taxpayer operated " 'on an established line' ". Likewise, the degree of regularity of operations between downtown Portland and the airports, as above depicted, brings the operations within the definition.

■ Furthermore, the administrative determination must govern where, as here, it is neither arbitrary nor unreasonable.[3]

■ The Treasury Regulations 42 were adopted in 1942, with substantially the same definition of "established line" which is found in earlier regulations. Congressional approval of the former regulations gives such regulation the force of law.[4] Further, since 1941 rates and substance in Section 3469 of the

pra, and Sec. 620(b) of the Revenue Act of 1942, c. 619, 56 Stat. 798].
**"Refunds and Credits**
"(a) Credit or refund of any overpayment of tax imposed by Subchapter B, Subchapter C, or Subchapter E may be allowed to the person who collected the tax and paid it to the United States if such person establishes, to the satisfaction of the Commissioner under such regulations as the Commissioner with the approval of the Secretary may prescribe, that he has repaid the amount of such tax to the person from whom he collected it, or obtained the consent of such person to the allowance of such credit or refund.

"(b) Any person entitled to refund of tax under this chapter paid, or collected and paid, to the United States by him may take credit therefor against taxes due upon any monthly return.

"(c) Any person making a refund of any payment on which tax under Subchapter B, Subchapter C, or Subchapter E has been collected, may repay therewith the amount of tax collected on such payment, and the amount of tax so repaid may be credited against the tax under any subsequent return."
26 U.S.C. 1952 ed. § 3471.

2. Treasury Regulations 42 (1942 ed.) :
"Sec. 130.58 **Motor Vehicles with**

**Seating Capacity of Less than 10.—**
"No tax is imposed on transportation by a motor vehicle having a seating capacity of less than 10 adult passengers, including the driver, unless such vehicle is operated on an established line. The term "operated on an established line" means operated with some degree of regularity between definite points. It does not necessarily mean that strict regularity of schedule is maintained; that the full run is always made; that a particular route is followed; or that intermediate stops are restricted. The term implies that the person rendering the service maintains and exercises control over the direction, route, time, number of passengers carried, etc. It implies also that the primary contract between the operator and the person served is for the transportation of the person and not for the hire or use of the vehicle."

3. Maryland Casualty v. United States, 251 U.S. 342, 40 S.Ct. 155, 64 L.Ed. 297; Brewster v. Gage, 280 U.S. 327, 50 S.Ct. 115, 74 L.Ed. 457.

4. Wilmette Park Dist. v. Campbell, 338 U.S. 411, 417–418, 70 S.Ct. 195, 94 L.Ed. 205; Crane v. Commissioner, 331 U.S. 1, 7–8, 67 S.Ct. 1047, 91 L.Ed. 1301; Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 114–115, 59 S.Ct. 423, 83 L.

1939 Code have been changed.[5] Congressional action was taken with knowledge of the definition given by the Regulations.[6]

Section 3471(a) of the Revenue Code of 1939 provides that a claim for refund of transportation taxes must be based on an erroneous collection, and that the claimant has borne the burden of the tax. The trial court's finding that appellant had not borne that burden is challenged as being contrary to the evidence. As heretofore noted, appellant had been notified by letter that the activities here depicted were within the statute. The one-way fare in effect was eighty-five cents per passenger and sixty cents per airline employee. Following August 21, 1949 the fare was increased to one dollar per passenger and this fare was in effect during July, 1950. There was one trip made during that year on account of which appellant concedes that $4 of transportation taxes were properly assessed, because on that occasion twenty-four persons were transported and each was charged one dollar. The same one dollar charge was made during July, 1950 for limousine transportation. The court below concluded that appellant likewise passed on to the passenger the tax through the increase in the fare.

The Royce case, supra, is quite similar, though there the increase in fare was made immediately after the transportation tax was increased. There the drivers notified the passengers that the fares included the taxes and the tax collected was kept segregate upon the company's books, while here the increase in rates was made approximately a year after receiving the notice from the Revenue Service. No word was given passengers that the fare included the tax, and appellant maintained no tax liability account on its books but included the entire fare as income. But, as observed by the trial court, there are two significant circumstances here, (1) the charge for rides on the bus was concededly not exempt from the transportation tax, and was the same as the fare charged to the passengers using the limousine service; and (2), the fares were raised in amount approximately equal to the tax. The inference was for the court to draw. It is reasonable and we conclude that it is supported in the evidence.

The Collector assessed and collected a penalty, and the Court approved such collection and assessment. Section 1718(c) provides that a taxpayer who willfully fails to collect and pay any tax imposed by the chapter shall be charged a one hundred percent penalty. The judge concluded that appellant acted willfully in failing to pay over the taxes. That this failure was intentional is apparent. However, appellant had been advised by competent counsel and by a Special Deputy Tax Collector in the Collector's office in Portland that it was not required to pay the tax. It relied and acted upon this advice.

Appellee would spell willfulness out of appellant's failure to comply with the demand in the letter of June 30, 1948. Appellant, however, in relying upon the advice given to it rather than upon the interpretation contained in the letter, does not show willfulness. Appellant's position was not arbitrary or unreasonable. This litigation and the long period of negotiation between appellant and the Commissioner preceding this action indicate this. Appellant acted in good faith and had reasonable cause to contest. We conclude that it did not act willfully.

Ed. 536; Helvering v. Winmill, 305 U.S. 79, 82–83, 59 S.Ct. 45, 83 L.Ed. 52.

5. Section 609 of the Revenue Act of 1942, c. 619, 56 Stat. 798; Section 302(a) of the Revenue Act of 1943, c. 63, 58 Stat. 21; Section 2, Joint Resolution of March, 31, 1949, c. 46, 63 Stat. 30; Section 607 of the Revenue Act of 1950, c. 994, 64 Stat. 906; Section 494 of the Revenue

Act of 1951, c. 521, 65 Stat. 452. Section 504(a) of the Excise Tax Reduction Act of 1954, c. 126, 68 Stat. 37, 26 U.S. C.A. § 3469 note.

6. Massachusetts Mutual Life Ins. Co. v. United States, 288 U.S. 269, 53 S.Ct. 337, 77 L.Ed. 739; Helvering v. R. J. Reynolds Tobacco Co., supra; Crane v. Commissioner, supra.

The cause is remanded to the District Court with direction to enter judgment for the one hundred percent penalty paid by the appellant to appellee. Otherwise the judgment is affirmed.