J. A. NEWSOME, Jr.

v.

UNITED STATES of America.

Civ. A. No. 67–H–404.

United States District Court
S. D. Texas,
Houston Division.

Oct. 4, 1968.

Robert I. White, Chamberlain & Hrdlicka, Houston, Tex., for plaintiff.

John H. Baumgarten, Wm. B. Butler, Asst. U. S. Attys., Houston, Tex., for defendant.

*Memorandum and Order*

SINGLETON, District Judge.

This is a civil action brought by plaintiff, J. A. Newsome, Jr., for recovery of $28.00, plus interest, representing a portion of a 100 per cent penalty assessment made pursuant to Section 6672 of the Internal Revenue Code of 1954. The penalty was assessed because of Mr. Newsome's alleged failure to pay over to the Internal Revenue Department federal withheld income taxes for the fourth calendar quarter of 1961 in the amount

of $31,074.81 and the first calendar quarter of 1962 in the amount of $7,724.-25. The withheld payroll taxes totaling $38,799.06 were due and payable by New Wolf Construction Company on wages paid its employees for this period of time. After paying a nominal amount of the tax assessed ($28.00) and filing a claim for refund, plaintiff filed this suit demanding refund of $28.00. The government counterclaimed for the balance due under the theory of its assessments, $39,000.00, plus interest.

Plaintiff, J. A. Newsome, Jr., was president of New Wolf Construction Company. New Wolf Construction Company was incorporated in 1960 and engaged in the construction of facilities relating to the oil and gas transmission business. Seven stockholders of this company invested approximately $60,000.00 to begin the business. Of the seven persons, three were actively engaged in the day-to-day operation of the business. These three persons were J. A. Newsome, Jr., president, Paul J. Wolfinger, vice president, and Mrs. Oleda J. Mixon, secretary-treasurer. This company actively continued in business until on or about February 14, 1962.

At the inception of the business operations of the company a certified public accounting firm and counsel were employed and retained. Of the three persons actively engaged in the company only Mrs. Mixon, secretary-treasurer of the company, worked in the company's main office in Houston all of the time, and she was in charge of the day-to-day administrative affairs. Mrs. Mixon, under the active supervision of the company's accounting firm, kept track of the accounts receivable and accounts payable, received moneys paid to the company, made deposits, kept payroll records, prepared payroll tax returns, not only for the federal government but also in the states in which the company was actively engaged in business, prepared checks to disburse money to creditors, including payments to state and federal taxing agencies, and attended to the mailing of all tax returns. Also Mrs. Mixon kept

the books of account from the beginning of the company through the end of May, 1961, under the supervision of the accounting firm. These books of account were kept manually, using standard journals and ledgers.

The company had a main bank account in Houston and payroll bank accounts near each job site. Payrolls at the various job sites were paid out of the payroll bank accounts. Either the job superintendent or the office manager at the job sites would prepare payroll sheets respecting each employee, such sheets reflecting gross pay, taxes withheld, union dues withheld, and the net pay. The checks were disbursed by the job superintendent or the office manager. Copies of checks, together with the payroll sheets, were mailed to the home office in Houston where Mrs. Mixon would verify the mathematics and then would post the sheets to individual payroll records. Mrs. Mixon would then draw a check on the company's main account in the approximate amount of the total net payroll and reimburse the field payroll bank accounts so that funds would be available in the field to pay the next week's payroll.

In the beginning two signatures were required on company checks, the signatories being Newsome, Wolfinger, and Mrs. Mixon. This system proved to be unsatisfactory because Wolfinger and Newsome were frequently out of the office, making it difficult to obtain two signatures on checks that had to be sent out. As a result, this procedure was changed so that the company funds could be disbursed over the signature of either Newsome, Wolfinger, or Mrs. Mixon and this procedure continued throughout the remaining history of the company.

About the end of May, 1961, the accounting firm approached Newsome and recommended that an automatic data processing system of accounting be employed. This recommendation was accepted by Newsome, and beginning June 1, 1961, and continuing thereafter, the accounting firm kept the books of account utilizing automatic data processing procedures. Under this system, copies of checks, copies of bank deposit slips, and copies of invoices were forwarded by Mrs. Mixon to the accounting firm's office. In addition, under the supervision of the accounting firm, Mrs. Mixon prepared certain journal vouchers with respect to depreciation and other regular recurring items that were necessary to bring the books up to date. These journal vouchers were prepared generally as of the last day of the month. The accounting firm presented to the company "printouts" or "machine runs" which disclosed financial information relating to the company. Newsome had difficulty understanding these printouts, and because of this difficulty, as well as requests from bonding companies and the company's main bank, the accounting firm was asked to prepare a balance sheet, as of November 30, 1961, and a profit and loss statement for the preceding six months. The company's fiscal year ended May 31. On or about December 27, 1961, the balance sheet and profit and loss statement were presented to the company. This balance sheet reflected total aggregate current assets of $345,266.58 and total aggregate current liabilities of $302,035.39. The balance sheet reflected no long-term liabilities and reflected other assets having a cost basis of $34,009.58. The profit and loss statement reflected earnings of approximately $66,000.00 during the operations of the preceding six months. The balance sheet and profit and loss statement were forwarded to the company's main bank and to the bonding companies that were supplying the bonds for jobs in progress.

Late in the afternoon of January 29, 1962, Mrs. Mixon informed Newsome that she had just concluded preparing the federal payroll tax return for the fourth quarter of 1961 and the return reflected a liability of approximately $31,000.00, and there were not sufficient funds in the company's checking account to cover this liability. The next morning Newsome contacted the accounting firm which checked the accuracy of the fourth

quarter payroll tax return. The accounting firm also attempted to assist Newsome in trying to collect sufficient receivables to pay the tax obligation. On January 31 Newsome called the company's regular attorney. This attorney was experienced in federal tax matters. The attorney came to the company's office, and, after discussing the situation in detail with Newsome, the following letter was drafted and mailed to the District Director:

"District Director of Internal Revenue
Austin, Texas

"Dear Sir:

"Enclosed are Form 941 and related documents for the quarter ended December 31, 1961, and Form 940 for the year 1961. The balance due on these returns is as follows: ·

| | |
|---|---|
| "Form 941 (after monthly deposits of $26,750.53) | $31,176.68 |
| "Form 940 | 1,737.42 |

"A check in the amount of $1,737.42 to cover the payment on the Form 940 is enclosed. Due to failure to collect certain accounts receivable as soon as was expected, we are not able to pay the balance due on the Form 941 today. We will attempt to make collections or negotiate a loan to cover this amount tomorrow, and we expect to be able to send our check for the $31,176.68 this week. We are confident that full payment can be made within 10 days.

"This Company has never been behind in the payment of payroll taxes before.

"Your consideration in this matter will be deeply appreciated.

"Yours sincerely,

NEW WOLF CONSTRUCTION CO.

By ————————————————
       President"

———◆———

The attorney representing the company also represented the company's main bank. At this time the company was indebted to the bank by way of notes approximating $86,000.00.

After January 31, 1962, Newsome signed checks from the company account in the total of $410.00, which funds were necessary to hold things together until the exact financial condition of the company could be determined.

On and after January 31, 1962, and up to February 14, there was a great deal of confusion on the part of Newsome and the other officers of the company in trying to ascertain the company's true financial condition, because other than the printouts and the November 30 profit and loss statement, there were no available books of account in the regular sense of that term.

On February 6, 1962, a federal tax lien came into existence in the amount of $31,-176.68 due by the company for payroll taxes for the fourth quarter of 1961. On February 9, 1962, Newsome was advised by his attorneys to sign a request for extension of the note due the bank and to execute a chattel mortgage on certain of the company's equipment.

On such advice, Newsome signed the necessary instruments. On February 14, 1962, the company's bank took the balance in the company's bank account and applied it toward the note owed by the company to the bank. The bank also took all of the company's furniture, equipment, and records, and in February sold all of the company's trucks and equipment, applying the money received to the indebtedness of the company to the bank. On February 15, 1962, Newsome tendered a check for $9,000.00 to the bank endorsed "for deposit New Wolf Construction Company," such funds representing stock subscriptions receivable received. These funds were also applied by the bank to the notes owed by the company to the bank. On or about February 15, 1962 the company's bank employed another accounting firm to try to piece together the financial condition of the company. This firm did so and prepared financial statements as of March 31, 1962, which reflected that the company had current assets of that date of $179,074.65, had other assets of $5,218.83, was indebted to the bank in the amount of $38,690.34, and indebted to the federal government in the amount of $40,518.77 for F.I.C.A. and withholding taxes. This new accounting firm also determined that the financial statements prepared as of November 31, 1961 by the then company's accounting firm were erroneous to the extent of approximately $100,000.00, in that sales were overstated by this amount as were accounts receivable. This error was unknown to Newsome. Therefore, Newsome did not know the true financial condition of the company until after mid-February, 1962. On February 14, 1962, the company's main bank took over control of the company's financial affairs. At this time the company had an account receivable from another active company in a substantial amount of money in excess of the amount necessary to pay the amount owed the federal government. For some reason unknown to this Court, after Newsome lost control of the affairs of the company and such were assumed by the company's main bank, neither the bank nor the Internal Revenue Service made any real effort to collect this account receivable or to collect other accounts receivable that were due. In fact, the record in this case does not reflect what disposition was ever made of $189,000.00 of current assets the company had as of March 1, 1962. The record does not reflect that Newsome had any knowledge of what occurred with respect to the operation of the company after February 14, 1962.

Payroll taxes for the first quarter of 1962 of $9,357.01 were not paid to the federal government. This amount accumulated by month as follows: January—$4,482.85; February—$4,264.56; and March—$609.60. Payrolls for February and March were not paid by the company but were paid by the company's main bank and one of the company's creditors.

During 1964 the Internal Revenue Service made an assessment against Newsome under § 6672 of the Internal Revenue Code of 1954 of $31,074.81 with respect to the fourth calendar quarter of 1961 and $7,724.25 with respect to the first calendar quarter of 1962. In making this assessment, the Internal Revenue Service took the position that Newsome was a responsible person who wilfully failed to pay over the withholding taxes of the company with respect to the two quarters involved.

■ This Court concludes that Newsome was a person within the meaning of §§ 6672 and 6671(b) of the Internal Revenue Code of 1954 up to and through February 14, 1962, but was not such a person thereafter.

The question to be determined is whether or not Newsome wilfully failed to pay over the taxes involved, or, if he did so wilfully fail, did he have reasonable cause for such failure. Frazier v. United States, 304 F.2d 528 (5th Cir. 1962); Dillard v. Patterson, 326 F.2d 302, 304, 305 (5th Cir. 1963); Cash v. Campbell, Jr., 346 F.2d 670 (5th Cir. 1965); Gray Line Co. v. Granquist, 237 F.2d 390, 395 (9th Cir. 1956); United States

v. Slattery, 224 F.Supp. 214 (E.D.Pa. 1963).

■■ The word "wilfully" as used in § 6672 does not mean "wilful" in the criminal sense, i. e., no tax evasion motive or other bad motive need be present. Hewitt v. United States, 377 F.2d 921 (5th Cir. 1967). To be wilful within the meaning of § 6672, it is necessary that the person involved voluntarily, consciously, and intentionally pay creditors instead of the United States at a time when he knew that making such payments would produce a preference. Hewitt v. United States, supra; Campbell v. Nixon, et al., 207 F.Supp. 826 (E.D. Mich.1962); Paddock v. Seimoneit, 147 Tex. 571, 218 S.W.2d 428, 7 A.L.R.2d 1062 (1949). As this Court held in a similar case, Barry v. United States, C.A. No. 67–H–368, the word "wilfully" simply means the exercise of a conscious, intentional, knowledgeable, or voluntary act as distinguished from an inadvertent act, and that in so acting the person involved did not have reasonable cause for not paying the Government and that reasonable cause in this sense means the failure to exercise ordinary care and prudence in connection with his actions. In this respect the burden of proof is on the taxpayer to prove by a preponderance of credible evidence that his failure to see that the taxes due were paid to the Government was not wilful, or, if so, was not the result of a lack of reasonable care on his part, reasonable care being defined as the failure to exercise ordinary care and prudence.

■ Even though a person is negligent in handling payroll tax matters, such does not produce liability under § 6672. Markewich v. U. S., 7 A.F.T.R.2d 845 (S.D.N.Y.1961).

■ Viewing the record in this case as a whole, the Court is persuaded that Newsome did not wilfully fail to pay over the payroll taxes involved for the fourth quarter of 1961 and for January of 1962, in that he had reasonable cause for not paying such taxes because of his reliance upon the advice and information furnished by regularly employed accountants and attorneys, and he was not negligent in following such advice in that in following such advice he exercised the degree of ordinary care and prudence required of a man in his position and under the circumstances described.

The Clerk will send copies of this Memorandum and Order to counsel of record.

Counsel for plaintiff shall prepare and submit a proposed final judgment to this Court in accordance with this Memorandum and Order, after first obtaining approval of counsel for the Government.