**ELMER CO., Limited, et al. (CORNISH et al., Interveners) v. KEMP.***

**No. 7174.**

Circuit Court of Appeals, Ninth Circuit.

Dec. 11, 1933.

*Rehearing denied February 23, 1934.

Franklin W. Peck, Walter J. Little, W. Eugene Craven, and Ivan G. McDaniel, all of Los Angeles, Cal., for appellants.

O'Melveny, Tuller & Myers and David R. Faries, all of Los Angeles, Cal. (Don F. Tyler and McIntyre Faries, both of Los Angeles, Cal., of counsel), for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and NORCROSS, District Judge.

WILBUR, Circuit Judge.

The property herein involved is in the possession of the receivers of the Elmer Company, Limited, appointed by the District Court of the United States in an equitable action brought by creditors of that corporation for the purpose of conserving the assets of the corporation. This action was brought by A. N. Kemp as receiver of the Guaranty Building & Loan Association to recover all the property and assets of the Elmer Company, Limited, upon the ground that all of such property was the proceeds of money embezzled by Gilbert H. Beesemyer from the assets of the Guaranty Building & Loan Association of Los Angeles, which will hereinafter be referred to as the building and loan association, and deposited with and used by the Elmer Company in the purchase of the assets in its possession at the time the receivers were appointed for such corporation.

It is admitted that between the 3d of May, 1921, and the 11th of December, 1930, Beesemyer feloniously appropriated and converted to his own use $8,145,000 of the assets of the building and loan association.

Appellants contend that the bill fails to state a cause of action by reason of the failure to trace the embezzled funds into the specific property in the possession of the appellants. The appellee did allege that no funds whatever were invested in the business of the Elmer Company except the embezzled funds of the building and loan association. We think this a sufficient allegation that the property in the possession of the appellants was derived wholly and exclusively from the embezzled funds, although, as will subsequently appear, the proof did not entirely sustain this allegation because the proof shows that other funds were furnished and used in the purchase of property now in the hands of the trustee.

The appellants claim that it was error for the trial judge to strike out the bill in intervention filed by the general creditors. It is sufficient to say in that regard that no appeal was taken from the order. The creditors are not parties to this appeal. The trial court, however, permitted the attorney for the intervening creditors to be associat-

ed with the attorneys for the receivers and to set up the same matters that were alleged in the creditors' bill in intervention.

■ Appellants claim that the court erred in permitting the appellee to read in evidence statements contained in the preliminary report of the appellants as receivers in the receivership of the Elmer Company. This evidence was admissible as a declaration of the appellants, and its weight was to be determined in connection with other evidence in the case. The fact that the report was a preliminary one did not render it inadmissible.

■ The next specification of error is thus stated: "The court erred in admitting into evidence over the objections of appellant the 'work sheets' received in evidence as plaintiff's Exhibit 2, the cancelled checks received in evidence as plaintiff's Exhibit 3, and the testimony of A. L. Moreton, given in reference thereto."

The original books of account and papers upon which the auditor's report was predicated were available to both sides. The testimony of the experts in reference thereto was merely to aid the court and the parties in the consideration thereof. It is clearly admissible for that purpose where the books were all in the custody of the court, and its receivers and were equally available to both sides. The books of the Elmer Company, Limited, showed that there was a balance of $1,861,431.73 owing to Gilbert H. Beesemyer for money he provided for its use at various times. It is stipulated that this amount was deposited in the bank account of the Elmer Company, Limited, by Beesemyer. Work sheet summaries were introduced in evidence showing that $1,882,850.94 had been withdrawn by Beesemyer from the building and loan association's funds and turned over to the Elmer Company, Limited. Of this amount $1,246,508.71 was paid to the Elmer Company, Limited, by checks drawn by Beesemyer upon the funds of the building and loan association, and $576,342.23 was paid to the Elmer Company, Limited, by checks of Beesemyer drawn on funds which he had withdrawn from the building and loan association and deposited to his own credit. Beesemyer, who is now in the penitentiary, testified that he had withdrawn about $1,200,000 from the funds of the association, and turned that amount over to the Elmer Company by checks of the building and loan association payable to the Elmer Company, and about $600,000 he had turned over by checks upon funds deposited in various banks in his own name, which funds had been withdrawn from the building and loan association's funds.

The theory of the appellee is that these moneys were embezzled by Beesemyer for the purpose of going into the business of prospecting for oil, and that all the property acquired by him was in furtherance of his plan to engage in that business with the hope and for the purpose of repaying the building and loan association money theretofore embezzled by him, and that the moneys subsequently embezzled and turned over to the Elmer Company were used in pursuance of this plan. Beesemyer testified substantially to this effect.

Pursuant to this plan Beesemyer caused the Elmer Company, Limited, to be incorporated with 2,500 shares of stock of the par value of $10 each. He subscribed for all but two of the shares, which were issued to his subordinates to qualify them as directors, and paid the face value thereof, $24,980, with funds embezzled from the building and loan association. Beesemyer, masquerading under the name of the Elmer Company, Limited, his alter ego, proceeded to acquire leases of prospective oil properties and to drill wells for the discovery and production of oil. Some of these wells proved to be dry holes and others practically nonproductive. In this way over $1,500,000 was dissipated. Oil was struck in Venice wells Nos. 1, 2, 3, 4, 5, and 6, and in Jameson wells Nos. 1, 2, 3, 4, and 5 at Santa Fé Springs. The flow of oil in Jameson wells Nos. 3, 4, and 5 had ceased, and they were unproductive at the time of the trial of this suit. Up to December 13, 1930, the day appellants were appointed receivers of the Elmer Company, $471,667.80 had been received from production of oil in the Venice and Jameson wells. In addition to the funds embezzled from the building and loan association, there were used in the drilling of the wells at Venice and Santa Fé Springs the sums of $225,000 advanced for that purpose by De Mille Productions, Inc., of which all but $81,000 has been returned, and $9,000 derived from Alexander Pantages under a special agreement for sharing expenses of drilling and also sharing in the oil produced from two wells which were in process of drilling at the time appellant receivers were appointed. The total value of all the assets of the Elmer Company at the time of the appointment of appellants as its receivers was $286,000.

The assets consisted of well drilling machinery located at the above-mentioned producing wells, or in a warehouse at Santa Fé

Springs. It was the opinion of some of the witnesses that the equipment which had been used in drilling the unproductive wells was obsolete and practically worthless; that all the leases acquired by the Elmer Company prior to the commencement of the producing wells at Santa Fé Springs (the Jameson wells) and at Venice had little or no value; and that the only assets of the Elmer Company which possessed any value were the producing wells, the personal property, drilling equipment and tools, purchased when drilling operations were being prosecuted on these wells, and money on hand. The creditors' claims, which amount to $467,544.33, consist of secured claims of $21,770.70, unsecured approved claims $178,606.61, unsecured, unallowed claims $93,952.79; miscellaneous notes payable $91,956.69; claim of De. Mille Productions, Inc., $81,257.54.

Austin P. Sutter, a witness for the defense, who had been connected with the Elmer Company prior to the receivership, in charge of its books, and who was an expert accountant, testified that he had examined the creditors' claims for the purpose of determining whether or not they should be allowed, and that as result of his investigation he found that all the material was on hand which was referred to in the approved claims; and that there was, in addition to the property and equipment referred to in the claims of creditors, other property and equipment on hand.

As we understand this testimony, the personal property, which was still unpaid for, the purchase price of which was over $200,000 (being secured claims $21,770.70, and unsecured claims $178,606.61), was still on hand at the time the receiver took charge of the assets of the Elmer Company. Some of this property (costing $178,606.61), furnished by the creditors who dealt with the company, was subjected to a trust in favor of the building and loan association to the exclusion of the creditors who had thus furnished the property on credit. It is clear from the evidence that in the drilling of the Jameson and Venice wells money which was embezzled by Beesemyer from the building and loan association was used and that, in addition thereto, money derived from De Mille Productions, Inc., and Pantages was used, and that those who are now creditors of the Elmer Company furnished material and supplies for these wells, perhaps to the extent of $350,000 or more in value. During the period that the Venice and Jameson wells were being drilled, other wells in other localities were also being drilled by the Elmer Company, and money for that purpose was embezzled from the funds of the building and loan association.

It is conceded by the parties, and the trial court held, and it is the law, that, in order to establish a constructive trust in favor of the building and loan association, it is essential that the money be traced by the claimant into specific property upon which it is sought to impress a trust. In re Estate of Arms, 186 Cal. 554, 561, 199 P. 1053; Newport v. Hatton, 195 Cal. 132, 150, 231 P. 987; Spokane County v. First Natl. Bank (C. C. A.) 68 F. 979; Schuyler v. Littlefield, 232 U. S. 707, 34 S. Ct. 466, 58 L. Ed. 806.

The appellee contends that he has sustained this burden of proof when he established the fact that the money derived from the building and loan association was used by Beesemyer in establishing the business of prospecting and drilling for oil. Upon this premise he contends that all of the property employed in the business of prospecting for and producing oil was impressed with the trust; that, as all other funds and property were invested or used in that business, such funds and such property also became impressed with the trust by reason of being commingled with the trust funds already employed in that business. Upon this basis it is claimed by appellee that, notwithstanding the fact that personal property still unpaid for was used in the business, it is nevertheless impressed with a trust in favor of the building and loan association and is not available to satisfy the claims of the general creditors, notwithstanding the fact that a part of the property thus sought to be impressed with the trust has been furnished by the general creditors whose claims are still unpaid. This view was adopted by the trial court in its decision of this case. In support of this contention appellee strongly relies on a decision of the Supreme Court of California in Byrne v. McGrath, 130 Cal. 316, 62 P. 559, 80 Am. St. Rep. 127. In that case the court held that, where a drug store purchased with trust funds was operated by the trustee, it was impressed with a trust, notwithstanding the change in the drugs and other articles in the store which had occurred during the ten years such business had been carried on. We are satisfied that that decision is not applicable to the operations conducted by the Elmer Company, for the reason that such operations were not a "business" within the meaning of that decision. It is true that for some purposes the operations of Beesemyer and the Elmer Company would be classed as a business. Later decisions of the California Supreme Court,

above cited, show that court adheres to the well-established principle of equity jurisprudence requiring that the party seeking to impress property with a trust must trace the trust funds into the specific property. Moreover, in a federal court of equity, we must decide cases in accordance with our view of the general principles of equity jurisprudence. Kuhn v. Fairmont Coal Co., 215 U. S. 349, 363, 30 S. Ct. 140, 54 L. Ed. 228; Russell v. Southard, 12 How. 139, 13 L. Ed. 927; Neves v. Scott, 13 How. 268, 14 L. Ed. 140. The decisions of the particular state in which the cause of action arose are to be followed only in so far as they conform to established principles of equitable jurisprudence. We believe, however, that there is nothing in the decisions of the Supreme Court of California inconsistent with the general principle of equity jurisprudence that, in order to establish a trust, it is essential for the claimant to follow the trust property into the specific property upon which it is sought to impose the trust. This rule was clearly recognized and stated by the trial judge during the trial of the case: " * * * He (the appellee) wants to take over the entire assets of the Elmer Company, and to eliminate, relegate, the others entirely out of the picture, because there would be nothing left for the other creditors, all of the Elmer Company, to participate in these assets. Now, before he can do so, he must establish two things, he must establish that by the preponderance of the evidence, and the burden never shifts to the other side; first, he must establish a trust; secondly, after he has established that trust, then, in order to obtain any preference to take over the assets, he must trace that fund that he claims he has imposed a trust upon into the hands of the receivers at this time."

The trial court decided that all the assets, money, and property of the Elmer Company which had come into the hands of the receivers constituted a trust fund belonging to the Guaranty Building & Loan Association, and directed that all this property should be turned over to its receiver. The theory upon which the court based its decision is disclosed in the memorandum opinion of the trial judge. This opinion may be epitomized as follows: That all the property in the hands of the receivers was purchased with the converted and embezzled money, and that, if there are any additions to such money, such additions are now undiscernible from the trust funds and moneys that are in the hands of the receivers of the Elmer Company; that this property constitutes a mass wherein the embezzled trust moneys of the Guaranty Company had been commingled and wherein it is impossible to distinguish any specific portion. With this premise the trial judge continues:

"The entire mass therefore, which is an oil enterprise, and corporate entity known as Elmer Company, Ltd., partakes of the nature of the original trust fund and it therefore equitably belongs to the Guaranty Association and to its depositors. None of the property now in the hands of the defendant receivers can be said to belong to anyone other than the Guaranty Association and its depositors, and the trust funds and money of the Guaranty Association have been sufficiently traced into the hands of defendant receivers (and is now in their possession), to remove any doubt under the authorities as to its identification.

"The general creditors of the Elmer Company, who furnished material or merchandise to that company passed title to it by completed sales wherein there was no condition or reservation of title and such materials are mingled with the money and funds of the Guaranty Association and can not be separated or distinguished from it. Under the circumstances shown the receiver of the Guaranty Association has the right to follow the trust fund, the embezzled and misappropriated money of the Guaranty either in its original form or in forms to which it has been converted or into a general fund or business with which it has been commingled."

It will be observed that by this process of reasoning the appellee was relieved of the burden of tracing the trust funds into the specific items of property in the possession of the receivers of the Elmer Company. This conclusion, as we have indicated, was predicated upon the theory that the entire business of the Elmer Company was itself a trust; consequently, that everything in that business was ipso facto impressed with a trust. Hence, although the general creditors were able to identify some of the property on hand as that sold by them for which they had not yet been paid, that property was impressed with the trust because it constituted a part of the assets of the business, and this notwithstanding that it is clear that no part of the embezzled funds were invested in the property. This, as we have pointed out, applies to property of the approximate cost of at least $178,000. As to this property it will be remembered the witness Sutter testified he had checked up the items of property on hand with the unpaid bills rendered for the purchase price thereof, and found the prop-

erty still on hand which had been thus purchased. These creditors, then, did trace into the hands of the receiver the machinery and other supplies which had been furnished by them and which had not been paid for. To the extent that this was done it is clear that, although the appellee was relieved by the trial court of the burden of proving that the trust funds furnished by the building and loan association had been applied to the purchase of these supplies, the appellants offered evidence which, if believed, affirmatively establishished that such property was not purchased with the funds derived from the building and loan association, that this property was procured on credit by the Elmer Company, and that no funds of the building and loan association were used in its purchase. Even if this evidence is completely discredited, it is clear that the receiver of the building and loan association has failed to establish that its funds were used for that purpose. On either theory the trust cannot be upheld as to such property. Indeed, on this appeal the appellee does not attempt to support the decree by pointing out evidence tracing its funds into the specific property in the hands of the appellants, but rests upon the claim that he has sustained the burden imposed upon him of tracing the funds of the building and loan association into property where he has traced it into the business of the Elmer Company.

Because of the theory upon which this case was tried and decided, namely, that the business of the Elmer Company was a trust business held by it in trust for the building and loan association, the record before us is insufficient to justify us in making or ordering a final decree based upon the theory that the assets of the building and loan association must be traced into specific property in order to impress that property with a trust in favor of the building and loan association. It will be necessary for the appellee to present additional evidence in order to establish his claims with relation to the oil wells at Santa Fé Springs and at Venice, and any other real estate, and to establish his claims in and to the tools, machinery, and similar property now on the oil leases or in the warehouse of the Elmer Company. The case must be remanded to the trial court for that purpose. If it should be found that the trial court on the evidence already adduced or upon such evidence as may be offered by the parties to supplement the evidence heretofore introduced that some of the moneys embezzled from the building and loan association or some of the profits derived from such money have been invested in real or personal property which was in the hands of the Elmer Company at the time its receivers were appointed, then as to that property a trust should be declared. If it be found that a portion of the money invested therein was trust funds and that other portions were derived from general creditors, or otherwise contributed, then the receiver of the Guaranty Company should be limited in his claims to a portion of such property proportioned to the amount of trust funds invested therein. Title Ins. & Trust Co. v. Ingersoll, 158 Cal. 474, 484, 111 P. 360; Perry on Trusts, § 828; 19 Harv. Law Rev. 512, note 2; 27 Harv. Law Rev. 125.

As to the property which is identified as purchased and unpaid for or purchased and paid for with funds derived from other sources than building and loan association or revenues derived therefrom, the property is not included in the trust. All property not thus included in the trust is subject to the claims of the general creditors except where impressed with liens, and then also as to the equity therein. Among these general creditors is the building and loan association to the amount of all funds of the building and loan association traced to the Elmer Company but not traced into the specific property now in the hands of its receivers. The building and loan association being entitled to participate in common with other general creditors in such funds and property as are not impressed with the trust, the receivers of the Elmer Company should retain the same to be disposed of by them, and the proceeds thereof should be distributed to the general creditors, including the building and loan association, in proportion to their respective claims. Certain funds of the building and loan association were, however, sufficiently traced into the hands of the appellants, and as to such funds the order directing such funds turned over should be sustained. As to an item of $259.83 being the balance in two accounts of the Elmer Company in the National Trust & Savings Bank, Los Angeles, Cal., it was conceded that this property was trust property. With reference to the $33,339.86 which, at the time of the appointment of receivers for the Elmer Company, was deposited with the building and loan association in an account known as No. 2526, the trial court held that this was a residue of trust funds aggregating $305,620.86. While this fund had been augmented by deposits therein of moneys advanced by De Mille and Pantages, the disbursements therefrom aggregated $272,290. Consequently, the court

held that, on the theory that, where a trustee disburses money from funds wherein he has commingled his own funds, it will be presumed that he is legally entitled to use the money paid out, and that therefore the disbursements are of moneys other than the trust funds. We think the finding of the trial judge in that regard is correct, and that the order in so far as it impressed a trust upon the balance in this account must be sustained.

Notwithstanding what we have said in regard to the testimony of the witness Sutter as to tracing of the property furnished by the creditors, we do not wish to be understood as interfering with the right of the trial judge to determine the credibility and value of this testimony. We have used this testimony by way of illustration rather than as a foundation for our decision, although there is no reason apparent in the record why this testimony is not credible and entitled to full weight. Nor do we wish to be understood as in any way interfering with the right of the trial judge, after the introduction of such additional evidence as may be offered by the parties in determining the effect thereof.

The decree of the trial judge will be affirmed as to the item of $259.83 and as to the item of $33,339.86. As to the balance of the property, the decision is reversed and the case remanded to the trial court for the introduction of such further evidence as the parties may offer and for decision upon the merits not in conflict with the principles announced in this decision.