John I. ALIOTO, Plaintiff,

v.

UNITED STATES of America,
Defendant.

UNITED STATES of America, Plaintiff,

v.

Richard F. BROUDE, et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

UNION BANK, Defendant.

Nos. C–81–2143 RPA, C–82–0475 RPA
and C–82–0919 RPA.

United States District Court,
N.D. California.

Aug. 9, 1984.

Joseph Alioto, Alioto & Alioto, San Francisco, Cal., for plaintiff.

Jeffrey S. Niesen, U.S.Atty., San Francisco, Cal., for United States.

Bernard Petrie, San Francisco, for Hitt & Devereaux.

## OPINION AND ORDER

AGUILAR, District Judge.

The above-captioned cases all revolve around the bankruptcy of the Pacific Far East Lines (hereinafter "PFEL") and the company's non-payment of payroll taxes withheld during the fourth quarter of 1977 and the first quarter of 1978. On November 10, 1983, the Court heard argument on a number of motions for summary judgment. Since the hearing, the Court has re-read the written arguments of counsel and has reviewed the documents submitted in connection with the motions. Based on these arguments and documents, and upon consideration of the relevant authorities, the Court hereby enters the following Opinion and Order addressing all of the motions before the Court.

### I. Summary Judgment

Summary judgment is warranted where there is no genuine dispute as to a material fact and the moving party is entitled to prevail as a matter of law. *Ybarra v. Reno Thunderbird Mobile Home Village*, 723 F.2d 675, 677 (9th Cir.1984). In considering a motion for summary judgment, courts must view facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Retail Clerks Union Local 648 v. Hub Pharmacy, Inc.*, 707 F.2d 1030, 1033 (9th Cir.1983). Summary judgment is not appropriate if contradictory inferences, one of which supports the non-moving party's position, can be drawn from the facts. *Sherman Oaks Medical Arts Center, Ltd. v. Carpenters Union No. 1936*, 680 F.2d 594, 598 (9th Cir.1982).

### II. *Alioto v. United States*, C–81–2143

#### A.

This action involves a penalty assessed by the Internal Revenue Commissioner (hereinafter "Commissioner") against John I. Alioto. Alioto was the president of PFEL and its wholly-owned subsidiary the Atlantic Bear Steamship Company (hereinafter "ABSC") [unless otherwise specified the two companies will be referred to col-lectively as "PFEL"] until mid-February 1978. James Hitt was PFEL's treasurer and William Devereaux was PFEL's controller at this time.

On January 31, 1978, PFEL filed a voluntary petition in bankruptcy; on February 3, 1978, ABSC did the same. The government contends that PFEL failed to pay $709,243.50 in payroll taxes that PFEL withheld from its employees during the fourth quarter of 1977 and the first quarter of 1978. The Commissioner assessed a 100% penalty against Alioto pursuant to section 6672 of the Internal Revenue Code. 26 U.S.C. § 6672.

Alioto brought this action, C–81–2143, seeking abatement of the penalty. He paid $200.00 of the assessment and claims jurisdiction under 26 U.S.C. § 7422. The government counterclaimed against Alioto, also naming Hitt and Devereaux as defendants, seeking entry of judgment in the amount of the penalty—$709,057.30—against each defendant.

The matter is before the Court on Alioto's motion for summary judgment, in which Hitt and Devereaux join. Alioto moved for summary judgment once before and the Court denied the motion, finding material fact issues in dispute. *Alioto v. United States*, No. C–81–2143 (N.D.Cal. Nov. 24, 1981).

#### B.

■ The government argues that imposition of the 100% penalty against Alioto is warranted under the following statute:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall ... be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672.

The Ninth Circuit has consistently held that the willfullness requirement is met

"when a responsible officer voluntarily, consciously, and intentionally causes his corporation to pay creditors out of withheld funds while he is aware that such funds are owed to the United States." *Maggy v. United States*, 560 F.2d 1372, 1375 (9th Cir.1977). Thus, no showing of evil motive or intent to defraud the United States is required, *Dudley v. United States*, 428 F.2d 1196, 1198 (9th Cir.1970); but, it must be shown that the responsible officer knew the taxes were due. *Id.* at 1200–01.

On January 31, 1978, Alioto convened a meeting at PFEL's offices. In attendance were Alioto, Hitt, Devereaux, James Boughey, and Richard Broude. Broude, a bankruptcy attorney, advised those in attendance that the withholding taxes would not have to be paid if a petition in bankruptcy were filed. On the basis of this advice, PFEL filed for bankruptcy and filed a payroll tax return, but did not pay the taxes that were due. The government does not dispute these facts.

Alioto makes three arguments in support of his position: (1) the failure to pay the taxes was not willful because he acted in good faith reliance on advice of counsel; (2) he did not have knowledge that the taxes were due because counsel had advised him that the taxes did not have to be paid; and (3) irrespective of counsel's advice, Alioto simply did not know that the taxes were due.

Alioto relies heavily on *Gray Line Co. v. Granquist*, 237 F.2d 390 (9th Cir.1956), to support the proposition that willfulness is negated by good faith reliance on advice of counsel. In *Gray Line*, the Commissioner assessed a 100% penalty against the company for failure to pay transportation taxes. The Ninth Circuit overturned the assessment, finding that Gray Line had acted in good faith and with reasonable cause as the company acted on the advice of both counsel and a Special Deputy Tax Collector. *Id.* at 395. Alioto argues that *Gray Line* should be controlling as PFEL acted in good faith reliance on Broude's advice.

■ The Court rejects this argument. While *Gray Line* has never been explicitly overruled, the clear weight of authority holds that willfullness is not negated because the action was taken in good faith and with reasonable cause. *See e.g. Barnett v. United States*, 594 F.2d 219, 221 (9th Cir.1979); *Bloom v. United States*, 272 F.2d 215, 223–24 (9th Cir.1959); *accord Monday v. United States*, 421 F.2d 1210, 1216 (7th Cir.1970); *contra Newsome v. United States*, 431 F.2d 742, 746–47 (5th Cir.1970) (very limited reasonable cause defense to willfullness recognized). Moreover, even assuming *arguendo* that *Gray Line* were applicable, it is readily distinguishable from the case before the Court. In *Gray Line*, the taxpayer relied not only on advice of counsel, but also on advice from a government agent. Here, PFEL relied solely on advice of counsel; therefore, the degree of reasonableness does not approach that found in *Gray Line*.

■ The Court also rejects Alioto's argument that because he relied on advice of counsel he lacked the knowledge that the taxes were due. Alioto relies on two Ninth Circuit opinions to support this argument: *Ferrando v. United States*, 245 F.2d 582 (9th Cir.1957), and *Estate of Lang v. Commissioner*, 613 F.2d 770 (9th Cir.1980). In both *Ferrando* and *Lang*, the Ninth Circuit examined the taxpayer's subjective knowledge of his tax liability in determining whether or not the assessment of a penalty for failure to file a tax return pursuant to 26 U.S.C. § 6651 was warranted.

■ Alioto argues analogously that a subjective knowledge standard should be adopted in cases involving the assessment of penalties pursuant to 26 U.S.C. § 6672. The Court declines to adopt such a standard for two reasons. First, in *Ferrando* and *Lang*, the court was reviewing the assessment of a penalty for *failure to file a return*. The statute authorizing penalties for failure to file a return specifies that the penalty is not warranted if "it is shown that such failure is due to reasonable cause and not due to willful neglect ...." 26 U.S.C. § 6651. The taxpayer's subjective knowledge goes to the existence

**1407**

of reasonable cause. *See Lang,* 613 F.2d at 774. The statute authorizing penalties for willful failure to pay over withheld taxes, 26 U.S.C. § 6672, does not, however, contain a reasonable cause exception and the Ninth Circuit does not recognize such an exception. *Barnett,* 594 F.2d at 221. Because the statutory authority for the two penalties is different, the Court finds *Ferrando* and *Lang* inapposite to the instant case.

Second, while the Ninth Circuit has held that willfulness requires that the taxpayer be aware that the taxes are due, *e.g., Maggy,* 560 F.2d at 1375, the court has also held that willfullness is not negated by the taxpayer's reasonable, but mistaken, belief that he is under no legal duty to pay the taxes. *Pacific Nat'l Ins. Co. v. United States,* 422 F.2d 26, 33 (9th Cir.1970). For example, in *Teel v. United States,* 529 F.2d 903 (9th Cir.1976), the State of Washington distrained the company's inventories to recover unpaid state taxes. Pursuant to an agreement with the state the inventories were released. The inventories were sold and the proceeds used to purchase new merchandise. Eventually, the company went bankrupt. The government assessed a section 6672 penalty against Teel, an officer of the financially-troubled corporation. Teel argued that he believed the agreement with the state relieved him of the obligation to pay withholding taxes. The court rejected this argument, holding that "[a] mistaken belief on the part of the responsible person that the tax need not or cannot be paid over does not suffice to render the failure to pay nonwillful." *Id.* at 906.

Thus, the Court holds that reliance on counsel's advice that taxes need not be paid does not negate the willfullness required by section 6672, and, therefore, does not excuse one from penalties for such nonpayment.

▮ Alioto argues further that, regardless of Broude's advice, he had no knowledge that the taxes were due on January 31, 1978. Alioto contends that Broude advised only Hitt and Devereaux that the

taxes need not be paid. Because Hitt and Devereaux thought the taxes did not have to be paid, they did not inform Alioto that the taxes were due on January 31, 1978. Alioto argues that this lack of knowledge is a sufficient basis for granting his motion for summary judgment.

If Alioto was not aware that the taxes were due, then he would be entitled to prevail as a matter of law. *Maggy,* 560 F.2d at 1375. But, the evidence is inconclusive as to Alioto's knowledge of the tax situation. In his affidavit, Alioto states that on January 31, 1978, he was not aware that the taxes were due. The deposition testimony of Hitt and Devereaux and Boughey's affidavit, however, support the contrary view. All three take the position that Alioto attended a meeting on January 31, 1978, at which the payroll tax situation was discussed extensively. It is not clear to the Court from this evidence whether or not Alioto was aware that the taxes were due. Thus, the Court finds a material issue of fact in dispute.

C.

As to Alioto, Hitt, and Devereaux's argument that summary judgment is warranted because they relied on advice of counsel, the Court holds that they are not entitled to prevail as a matter of law. As discussed above, a reasonable belief, based on advice of counsel, that the taxes were not due is not a sufficient basis for relieving one of liability under 26 U.S.C. § 6672. Accordingly, the Court denies the parties' motion on this ground.

As to Alioto's argument that summary judgment is warranted because he was unaware that the taxes were due, the Court finds a genuine dispute as to a material fact. The evidence supports an inference that Alioto possessed knowledge that the taxes were due on January 31, 1978. It is not appropriate for the Court to "weigh the evidence, pass upon credibility, or 'speculate as to ultimate findings of fact'" on a motion for summary judgment. *Pepper and Tanner, Inc. v. Shamrock Broadcasting Inc.,* 563 F.2d 391, 393 (9th Cir.1977).

Accordingly, the Court denies Alioto's motion for summary judgment on the ground that he was not aware that the taxes were due.

## D.

■ Alioto also moves for partial summary judgment as to $355,322.02. Alioto contends that a check in this amount was tendered to the Union Bank, a U.S. tax depository, on January 25, 1978. Although the check was later dishonored, Alioto claims that he did not learn of this until November 1978, some ten months later. Alioto concludes that because the check for $355,322.02 was tendered to the government there was no willful failure to pay as to this amount.

Alioto contends that *Dudley v. United States*, 428 F.2d 1196 (9th Cir.1970), is controlling. Dudley was the president of a corporation. In early May 1960, Dudley mailed a payroll tax check to the IRS. The IRS did not present the check for payment until June 1960, at which time the bank refused to honor the check. Dudley was not informed until July 1960 that the check was dishonored, and, in the meantime, Dudley ceased to be the person responsible for paying the company's taxes. The Ninth Circuit found that Dudley had no knowledge, or reason to suspect, that the check would not be paid, and the court held that Dudley was not liable for willful failure to pay under 26 U.S.C. § 6672.

While the Court finds the factual situation in *Dudley* similar to the instant case, the Court does not feel compelled to rule in Alioto's favor on this motion. In *Dudley*, the court held that the issue of willfullness is a factual question, *id.* at 1200, and that the mere tendering of a check does not relieve one from liability under section 6672, *id.* at 1201. Dudley was not aware that the check was dishonored nor did he have reason to suspect that it would be dishonored. But here, as discussed *supra*, there is a factual dispute as to Alioto's knowledge concerning the payroll tax situation, and, as discussed *infra*, a dispute as to whether either Union Bank or Bank of California (hereinafter "BankCal") was responsible for the check's non-payment. Thus, the Court holds that the mere tendering of the check is not a sufficient basis for the Court to grant Alioto's motion for summary judgment. There still being material fact issues in dispute, the Court denies Alioto's motion for partial summary judgment as to $355,322.02.

## E.

Alioto also moves for partial summary judgment as to $177,234.34—payroll taxes withheld during the fourth week of January 1978 and due on February 3, 1978. Alioto argues that as of the filing of the petition in bankruptcy on January 31, 1978, he ceased to be a responsible person accountable under section 6672.

■ For purposes of section 6672, a responsible person is "one who has the final word on which bill should or should not be paid." *Maggy*, 560 F.2d at 1374. This does not mean, however, that the person must have exclusive control over the payment of bills, significant control is sufficient. *Dudley*, 428 F.2d at 1201.

■ Alioto contends that following the filing for bankruptcy the Bankruptcy Court exercised complete control over the payment of bills and that he returned to the office only to tender his resignation. Alioto argues that he no longer had the "final word" over the payment of bills and, therefore, was no longer a responsible person under section 6672.

Alioto relies heavily on *Maggy* and *Dudley* to support this argument. In both, the Ninth Circuit held that an officer of a corporation was not a responsible person. *Maggy*, 560 F.2d at 1375; *Dudley*, 428 F.2d at 1202. Maggy had been company president and chairman of the board. The court held that he had ceased to be a responsible person as he had resigned his presidency and, through explicit agreement, had abdicated responsibility for the payment of bills to a financial committee. *Maggy*, 560 F.2d at 1374. Dudley, too, was the president of a company. While Dudley did not resign

as president, the court, nevertheless, held that he was not a responsible person because, through explicit agreement, he had given up almost all control over the company to another party. *Dudley,* 428 F.2d at 1201–02.

Here, although Alioto contends that Hitt, Devereaux, Broude, and Boughey were responsible for the payment of bills after the filing for bankruptcy, there is no evidence of any explicit agreement relieving Alioto of responsibility for the payment of bills. To the contrary, in his affidavit, Boughey states that beginning in mid-January Alioto exercised complete control over the company's cash. Thus, the situation here is factually distinguishable from *Maggy* and *Dudley.*

From the evidence presented, the Court cannot find that Alioto had ceased to be a responsible person for section 6672 purposes. By his own admission, Alioto did not tender his resignation as president until February 4 or February 14. Just because he did not come to the office does not mean he had ceased to have control over the payment of bills. Moreover, his contention that the filing for bankruptcy divested him of all control over the payment of bills is unfounded. To support this contention Alioto refers to a memorandum from Kathleen Stiller, a bankruptcy technician, ordering that PFEL "promptly pay all taxes accruing during the Chapter XI proceedings." This memorandum could hardly be interpreted to divest PFEL's officer of all control over the payment of bills, as evidenced by the failure to pay taxes in defiance of the order. Additionally, the memorandum only refers to taxes accruing during the Chapter XI proceedings and the taxes in issue accrued during the fourth week of January, prior to the initiation of the bankruptcy proceedings.

For the reasons stated above, the Court denies Alioto's motion for partial summary judgment as to $177,234.34.

### III. *United States v. Broude, et al.,* C–82–0475

#### A.

This action involves the government's attempt to recover PFEL's unpaid taxes from amounts PFEL paid to counsel as retainers. PFEL paid the retainers to James Boughey of Dorr, Cooper & Hays and Richard Broude of Irell & Manella (hereinafter "the attorneys") to secure representation for PFEL and its subsidiaries in the Chapter XI bankruptcy proceedings.

As discussed earlier, Alioto, Hitt, Devereaux, Boughey, and Broude attended a meeting on January 31, 1978. At this meeting it was decided that PFEL would file for bankruptcy. Also discussed were PFEL's payroll tax situation and the payment of retainers to secure the services of counsel. It was decided that the retainers should be paid even though this would leave PFEL with insufficient funds to meet its tax obligation. Broude was paid $125,000 by a certified check drawn on PFEL's BankCal account. Boughey was paid a total of $125,000 by two certified checks— one for $90,000 drawn on PFEL's BankCal account, the other for $35,000 drawn on ABSC's Union Bank account.

The government brought this action, C–82–0475, to recover the amounts paid to the law firms. The government argues that the funds used to pay the retainers were held in trust for the government as withheld payroll taxes. According to the government, because the attorneys accepted the retainers knowing that the funds were owed to the government, a constructive trust was impressed upon those funds, and the government as the beneficiary of the trust can recover these funds. Boughey and Broude raise a number of arguments against the imposition of a constructive trust and also argue that the government should be equitably estopped from bringing this action.

The Court has previously ruled on motions for summary judgment in this matter. On June 16, 1983, the Court denied Boughey's motion for summary judgment on the ground that equitable estoppel was not warranted because Boughey failed to show affirmative misconduct by the government. The Court also held that there was not sufficient evidence to support the govern-

ment's motion for summary judgment under a constructive trust theory.

The matter is before the Court again on the parties' cross-motions for summary judgment.

## B.

The government argues that Boughey and Broude are liable for the $250,000 paid in retainers as constructive trustees. Pursuant to 26 U.S.C. § 7501(a), PFEL held amounts withheld as payroll taxes in trust for the government. Section 7501(a) provides that:

Whenever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States.

26 U.S.C. § 7501(a).

On January 31, 1978, the government alleges, PFEL paid, and Boughey and Broude accepted, $250,000 that all parties knew was owed to the government. The government contends that it can recover such amounts from the attorneys because California law provides that "[e]very one to whom property is transferred in violation of a trust, holds the same as an involuntary trustee under such trust, unless he purchased it in good faith, and for a valuable consideration." Cal.Comm.Code § 2243.

The attorneys argue that they are not liable under section 2243 for two reasons: first, the government has failed to trace the trust funds into their hands, and, second, the attorneys accepted the retainers in good faith and for valuable consideration.

## C.

A trust will only arise when there is "a nexus between the funds collected and the trust created." *Slodov v. United States,* 436 U.S. 238, 256, 98 S.Ct. 1778, 1789, 56 L.Ed.2d 251 (1978). More importantly to the instant action, a constructive trust will only arise when the trust funds can be traced to the monies held by the alleged constructive trustee. *Ljepava v. M.L.S.C. Properties, Inc.,* 632 F.2d 815, 816 (9th Cir.1980). Thus, the attorneys cannot be held liable as constructive trustees unless the government can trace the withheld taxes to the funds used to pay the retainers.

PFEL did not keep the trust funds in a separate account. Rather, the company commingled its individual funds with the trust funds. The attorneys argue that following the payment of the retainers the commingled accounts still contained funds sufficient to pay the taxes, and, therefore, the retainers were not paid with trust funds. In *Elmer Co. v. Kemp,* 67 F.2d 948 (9th Cir.1933), the Ninth Circuit held that in the event that disbursements are made from commingled funds, such disbursements are presumed to have come out of individual funds first. *Id.* at 954. Under this principle, the attorneys would not be constructive trustees if they could show that PFEL still had enough funds to pay its taxes after payment of the retainers.

In *Republic Supply Co. v. Security First Nat'l Bank,* 79 F.2d 375 (9th Cir. 1935), however, the Ninth Circuit held that the presumption that individual funds were disbursed first applies only when the disbursed funds were dissipated in the hands of the transferee. *Id.* at 378. Where the disbursed funds are still in the transferee's possession and the beneficiary has identified the transferee, a "strong prima facie showing of tracing was made" and the burden of showing that individual, not trust, funds were used shifted to the defendant. *Id.* at 378. In this case, the retainers have not been dissipated in the hands of the attorneys. Therefore, the Court holds that the government has made a prima facie showing of tracing and the attorneys have failed to rebut this showing.

Furthermore, assuming *arguendo* that the retainers are presumed to have been paid out of individual funds, there appears to be a dispute as to how much cash remained available for the payment of taxes. The attorneys contend that at closing on January 31, 1978, PFEL bank accounts con-

tained $459,990 in deposits. The government contends that $395,336 of the amounts shown on the books had been deposited on January 30 and 31 and were not available for withdrawal until the deposit checks were honored. Thus, there is a dispute as to a material fact, which alone would be a sufficient reason for denying the attorneys' motion for summary judgment. *Ybarra*, 723 F.2d at 677.

■ The attorneys also argue that on January 9, 1978, an overdraft was created on PFEL's BankCal account and, as such, any trust funds were dissipated. In *Schuyler v. Littlefield*, 232 U.S. 707, 34 S.Ct. 466, 58 L.Ed. 806 (1914), the Supreme Court held that once a commingled account is wholly depleted the trust funds are dissipated and the trust cannot be revived by subsequent deposits. *Id.* at 710, 34 S.Ct. at 466. The attorneys contend that *Schuyler* is dispositive of this action.

The Court rejects this argument for two reasons. First, in *Slodov v. United States*, 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978), the Supreme Court held that the withheld taxes need not be "segregated from the employer's general funds ... or ... be deposited in a separate bank account until required to be paid to the Treasury." *Id.* at 243, 98 S.Ct. at 1783. By the attorneys' own admission, PFEL had 25 different bank accounts and paid general expenses out of at least six of these accounts. Thus, it does not follow that the trust fund was dissipated and could not be revived because one account was depleted by an overdraft. Second, even where a trust fund has been dissipated, it has been held that the trust can be revived by subsequent deposits that are specifically intended to achieve this purpose. *In re Gottfried Baking Co.*, 312 F.Supp. 643, 645 (S.D.N.Y. 1970); Restatement (Second) of Trusts § 202 comment m. Here, PFEL deposited funds in the BankCal account subsequent to the account's depletion on January 9, and apparently planned to pay the taxes with these funds. Thus, PFEL apparently deposited these funds with the intent of reviving the trust and such intent is not altered by the fact that PFEL did not eventually use the funds for this purpose.

For the reasons stated above, the Court rejects the attorneys' argument that the government has not traced the trust funds into their possession.

### D.

■ The attorneys also assert that they cannot be held liable as constructive trustees because they accepted the retainers in good faith and for valuable consideration. There is no dispute that the retainers were accepted for valuable consideration, but there is a dispute on the issue of good faith.

In *California v. Larkin*, 413 F.Supp. 978 (N.D.Cal.1976), Chief Judge Peckham of this Court held that for purposes of California Commercial Code section 2243 the "term 'good faith' does not mean absence of evil motive, or ... absence of profit; rather, the critical factor is absence · of knowledge." *Id.* at 983. Larkin controlled a charitable trust. In order to secure a loan for Larkin Aircraft from the Small Business Administration (hereinafter "SBA"), Larkin pledged trust property as collateral. Larkin Aircraft defaulted on the loan and the State of California sought to recover the property from the SBA under the theory of constructive trust. The court held that the SBA was a constructive trustee because it knew that the property was held in trust at the time the SBA accepted it as collateral. *Id.* at 983.

Thus, the crucial question in the instant action is whether the attorneys knew their retainers were coming out of trust funds. The government contends that the payroll tax situation and the inability of PFEL to pay both the taxes and the retainers were discussed at the January 31 meeting. This contention is supported by the deposition testimony of Hitt and Devereaux and the affidavit of Boughey. In his affidavit Boughey states: "In the view of all concerned, payment to the law firms came first so the company would have counsel in the bankruptcy case, and that meant the $225,000 tax liability owing to the IRS

**1412**

could not be paid." Boughey now takes the position that, while he knew taxes were due, he did not know that these were withheld payroll taxes. Broude simply denies any knowledge that the taxes were due.

The Court finds that contradictory inferences can be drawn from the evidence in the record. The existence of such contradictory inferences makes this an inappropriate case for summary judgment. *United States v. Lange*, 466 F.2d 1021, 1026 (9th Cir.1972). The Court believes that a trial is necessary to resolve the issue of good faith. A trial will provide the opportunity to cross-examine and test the credibility of the various witnesses. Accordingly, the Court denies the parties' cross-motions for summary judgment on the applicability of section 2243.

### E.

The attorneys also advance two somewhat contradictory arguments supporting their motions for summary judgment: first, that the government's action is premature until resolution of the government's claim in bankruptcy court; and, second, that the government should be equitably estopped from pursuing this action because it did not file its claim until four years after the events in question.

In support of the first argument, the attorneys primarily rely on *In re Brookmart*, 338 F.Supp. 901 (C.D.Cal.1972). The Court finds that *Brookmart* is inapposite to the case at bar. Brookmart made a general assignment for the benefit of creditors, and, as a result, $2,721.00 in withheld taxes were not paid to the government. Later, Brookmart went bankrupt and the assignee turned over all Brookmart property in his possession to the trustee in bankruptcy. The government sought to hold the assignee personally liable for the unpaid taxes. The court held the assignee liable, but held further that the government could not collect from the assignee unless it was unable to collect from the bankrupt's estate. *Id.* at 903–04. From the holding in *Brookmart*, the attorneys argue that the government cannot pursue

the instant action until the resolution of the bankruptcy proceedings.

The Court fails to see the logic behind the attorney's argument. *Brookmart* is clearly distinguishable from the instant action. In *Brookmart*, the assignee was liable for the unpaid taxes, not as a constructive trustee, but under 31 U.S.C. § 192 (current version at 31 U.S.C. § 3713) which provides that the government can hold an assignee personally liable if the assignee pays any debts of the assignor before paying the assignor's debts to the government. Moreover, the *Brookmart* court did not hold that the action against the assignee was premature nor did it extinguish the assignee's personal liability. 338 F.Supp. at 903–04. The court did condition the assignee's liability on the government's inability to collect from the trustee in bankruptcy as the assignee had turned over all Brookmart assets in his possession to the trustee. *Id.* Here, the attorneys were not assignees of PFEL charged with the duty of paying PFEL's debts, nor have the attorneys turned over the retainers to PFEL's trustee in bankruptcy. For these reasons, the Court finds *Brookmart* factually distinguishable from the current action. Furthermore, *Brookmart* did not hold that the action against the assignee was premature, as the attorneys contend.

Settled trust law principles allow the beneficiary to bring the action against the trustee and the constructive trustee, either separately or jointly as co-defendants. Restatement (Second) of Trusts § 295 comment a; 4 *Scott on Trusts* § 295 (3d ed. 1967). Moreover, there is no requirement that the beneficiary's action against the constructive trustee be premised on the beneficiary's inability to recover from the trustee. The Court holds that the government, as beneficiary, does not have to await the resolution of the bankruptcy proceeding in order to bring this action against the attorneys.

The attorneys' argument that equitable estoppel should bar the government from bringing this claim is also unfounded.

The gist of the attorneys' argument is that the government's failure to bring this claim until four years after the occurrence of the disputed events constitutes affirmative misconduct on the part of the government. The Court rejected an identical argument in ruling on Boughey's earlier motion for summary judgment. *United States v. Broude, et al.*, No. C–82–0475 (N.D.Cal. June 16, 1983).

In its earlier Order, the Court held that the Ninth Circuit's decision in *United States v. Harvey*, 661 F.2d 767 (9th Cir. 1981), requires a showing of affirmative misconduct as an element of equitable estoppel against the government. *Harvey* involved a dispute between the government and the Harveys as to the ownership of a parcel of land. In 1960 the government surveyed the land, but did not claim title to the land until 1967. *Id.* at 769. The Harveys argued that the government's failure to notify them of the claim until 1967 constituted affirmative misconduct and was a sufficient basis for estopping the government's action. *Id.* at 775. The court held that failure to notify a party of a possible claim against him does not constitute affirmative misconduct unless there is a showing of active or intentional concealment. *Id.*

The situation in the instant action is very similar to that found in *Harvey*. The government knew the facts supporting its claim in late 1978, but at that time it was unaware of the legal theory under which the claim was eventually brought. The attorneys have made no showing that the government actively or intentionally concealed the claim prior to 1982. Accordingly, the Court denies the attorneys' motion for summary judgment on equitable estoppel grounds.

### F.

■ Broude submits the additional argument that summary judgment should be granted as to him on the ground that he is not a proper defendant in the action. Broude argues that the retainer was paid to Irell & Manella, not Broude individually, and Broude has since left the firm. The Court rejects this argument as Broude was an Irell & Manella partner at the time of the payment. Partners are jointly and severally liable for partnership obligations and such liability is not discharged simply because one leaves the partnership. Cal. Corp.Code §§ 15013, 15015, 15036. Accordingly, Broude's motion for summary judgment is denied.

### IV. *United States v. Union Bank*, C–82–0919

#### A.

Union Bank in its capacity as a U.S. tax depository accepted a PFEL check in the amount of $355,322.02, representing payroll taxes due. The government alleges that Union Bank failed to use ordinary care in presenting or sending for presentment the PFEL check to the drawee, BankCal. Because of Union Bank's alleged mishandling, the check was not honored by BankCal and the government did not collect the taxes due. The government brought this action, C–82–0919, to recover from Union Bank the amount of the check.

■ In early 1983, the parties filed cross-motions for summary judgment. Generally, when a party moves for summary judgment, the party asserts that there is no genuine issue of material fact. Fed.R. Civ.P. 56. It does not follow, however, that when both parties move for summary judgment they agree that there is no genuine issue of material fact. *United States v. Curtis-Nevada Mines, Inc.*, 415 F.Supp. 1373, 1376 (E.D.Cal.1976). Such was the case here. The Court found the existence of a genuine dispute as to the date on which Union Bank received the check. Accordingly, the Court denied the cross-motions for summary judgment. *United States v. Union Bank*, No. C–82–0919 (N.D.Cal. June 16, 1983).

The matter is again before the Court on the government's motion for summary judgment. The government contends that new evidence conclusively establishes that Union Bank received the PFEL check on January 25, 1978, and, therefore, the

government is entitled to summary judgment in its favor. Union Bank moves for reconsideration of the Court's denial of Union Bank's earlier motion for summary judgment.

### B.

■ California Commercial Code section 4202(1)(a) requires that a collecting bank—Union Bank in this instance—exercise ordinary care in presenting or sending for presentment a check deposited for collection. The collecting bank exercises ordinary care if it takes proper action on the check before midnight of the day following receipt of the check. Cal.Comm.Code § 4202(2). If the collecting bank fails to take proper action before the midnight deadline, the collecting bank has the burden of establishing that it exercised ordinary care. The parties agree that this is the applicable law.

The primary question presented to the Court by the government's motion is whether a genuine dispute exists as to the receipt date of the check. The government contends that Union Bank received PFEL's check on January 25, 1978, but did not present it to BankCal for payment until January 30. The government thusly maintains that Union Bank missed the midnight deadline, and thereby failed to exercise ordinary care. Union Bank contends that it received the check on Friday, January 27, and presented it to BankCal on the following Monday, January 30, meeting the midnight deadline.

If the government could show that Union Bank received the check on January 25, then the government would be entitled to summary judgment as a matter of law under California Commercial Code section 4202.

### C.

In support of their earlier cross-motions for summary judgment the parties submitted declarations and deposition testimony from a number of PFEL and Union Bank employees. The government established that if PFEL's ordinary business practice in handling payroll tax checks was followed, the check would have been delivered to Union Bank on January 25. Since no PFEL employee could recall that the ordinary practice was not followed, the government argued that PFEL delivered the check to Union Bank on January 25. Union Bank established its ordinary practice in handling depository checks and, applying reasoning similar to the government's, contended that it received the check on January 27. The government also presented a receipt for the check dated January 25, 1978, signed by Union Bank employee Connie Ramirez. Union Bank, in opposition, presented Ramirez's deposition testimony that in signing these receipts it was not her usual practice to verify the date on the receipt, just the dollar amount. From this evidence, the Court could not draw any conclusions as to which date Union Bank received the check.

In the instant motion the government contends that new evidence establishes conclusively that Union Bank received the check on January 25, 1978. The government reiterates the facts presented in support of the earlier motions and presents the deposition testimony of Devereaux, PFEL's controller, and Sylvia Ortman, PFEL's payroll and tax clerk.

Devereaux's testimony corroborates the earlier evidence establishing PFEL's ordinary business practice. Devereaux also testified that he specifically recalled signing the check on January 25, 1978. He was not able, however, to testify that the check was delivered to Union Bank on that day. Ordinarily, he continued, the check would be delivered on the day it was signed and, since he was not informed otherwise, he had no reason to believe the check was not delivered to Union Bank on January 25. This is merely supposition based upon PFEL's ordinary practices.

Ortman's testimony, too, corroborates the evidence establishing PFEL's ordinary business practice. Ortman recalls preparing the check and delivering it to Devereaux for his signature on January 25. Ortman testified that ordinarily the receipt

was returned to her on the day the deposit was made. But, Ortman could not specifically recall the return of the receipt which Ramirez had signed. The government, nevertheless, argues that the receipt was returned on January 25 as this was the date on which it ordinarily would have been returned. Again, the government's argument is based on supposition premised upon PFEL's ordinary business practice.

While Devereaux's and Ortman's testimony support the government's position, it can hardly be said that this testimony conclusively establishes that which the Court previously has said was not conclusively established—namely, that Union Bank received the check on January 25. From the evidence presented to date, inferences can be drawn that either January 25 or January 27 was the date of receipt. An inference that Union Bank received the check on January 27 would establish that Union Bank did not violate California Commercial Code section 4202. Where the evidence supports an inference favoring the non-moving party, as here, summary judgment is not appropriate. *Sherman Oaks Medical Arts Center*, 680 F.2d at 598. Accordingly, the Court denies the government's motion for summary judgment.

## D.

 Union Bank argues that the government renewed its motion for summary judgment in bad faith, thereby entitling Union Bank to recover the cost of opposing the motion, including attorneys' fees. Union Bank's basic argument is that the government's motion presents substantially the same argument as presented in the earlier motion, which the Court denied, and that the new evidence in fact offers nothing new and is based largely on misrepresentations of the testimony. For these reasons, Union Bank asserts that the government has acted in bad faith.

Union Bank contends that recovery of the costs of suit is warranted by Federal Rule of Civil Procedure 56(g) and the Equal Access to Justice Act, 28 U.S.C. § 2412. Rule 56(g) provides that a party can recover reasonable attorneys' fees if the court is satisfied that the other party has presented affidavits, either in support or opposition to a motion for summary judgment, in bad faith or solely for the purpose of delay. Fed.R.Civ.P. 56(g). The Equal Access to Justice Act provides that the prevailing party can recover reasonable attorneys' fees when the United States is a party to the action "to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." 28 U.S.C. § 2412(b).

Union Bank relies on *Alart Assoc., Inc. v. Aptaker*, 279 F.Supp. 268 (S.D.N.Y. 1968), to support its argument that attorneys' fees are warranted under Rule 56(g) when a party files a motion for summary judgment that is substantially identical to an earlier motion that had been denied. Union Bank fails to point out that the filing of a substantially-identical motion alone did not constitute bad faith in *Alart*. In *Alart*, Aptaker's first motion for summary judgment was denied initially and also upon a motion for reargument. Aptaker then filed a second motion for summary judgment. In all three motions Aptaker sought "to magnify an inadvertent clerical error by plaintiff to the level of a substantial defense warranting dismissal of the action ...." *Id.* at 269. The *Alart* court found bad faith not simply on the basis of the filing of a motion substantially identical to a prior motion, but because Aptaker's motions were wholly meritless, or, in the court's language, "frivolous and dilatory." *Id.* at 270.

The government's motion, indeed, makes substantially the same argument as presented in its prior motion, but the situation is easily distinguished from that found in *Alart*. In *Alart*, the court held that the existence of an inadvertent clerical error was not a basis for granting a motion for summary judgment as a matter of law. The submission of further evidence could not change the court's holding, yet, Aptaker brought another motion alleging the same facts and making the same argument.

Here, in denying the government's earlier motion, the Court held that there was insufficient evidence to determine the date on which Union Bank received the check. The implication was that further evidence might make the case ripe for summary judgment. Accordingly, Union Bank is not entitled to recover costs pursuant to Rule 56(g).

### E.

Union Bank also seeks reconsideration of the Court's denial of Union Bank's earlier motion for summary judgment on June 16, 1983. Union Bank contends that the Court's Order does not address one of the arguments presented in favor of the motion: that Union Bank is entitled to summary judgment because the government has failed to put forth any evidence that Union Bank's alleged mishandling of the check damaged the government. The Court will now address this argument.

While the Ninth Circuit has not addressed this issue, the Seventh and Eighth Circuits have held that the plaintiff must prove his damages to recover for a bank's failure to provide the plaintiff with timely notice that checks were being returned because of insufficient funds. *Appliance Buyers Credit Corp. v. Prospect Nat'l Bank,* 708 F.2d 290 (7th Cir.1983); *Marcoux v. Van Wyk,* 572 F.2d 651 (8th Cir. 1978). The government does not dispute that this is the applicable law, but contends that there is enough evidence to preclude summary judgment on this issue.

In *Marcoux,* Marcoux sold cattle to Mid-States Livestock, accepting sight drafts as payment. Marcoux's bank forwarded the drafts to First National Bank. At Mid-States request, First National held the drafts past the payment deadline set by Iowa law. On the day the drafts were received by First National, Mid-States collapsed financially. The drafts were returned unpaid to Marcoux approximately two weeks later. Marcoux brought an action against First National to recover the face value of the drafts. He argued that the bank's mishandling of the drafts pre-

vented him from taking other actions to recover the money owed to him. The Eighth Circuit found that even if the checks had been returned before the deadline there was only the "most remote possibility" that Marcoux could have collected any money from Mid-States. 572 F.2d at 656. All of Mid-States' assets were subject to prior liens, and, as such, there was nothing for Marcoux to collect. *Id.* at 654. The court held that the plaintiff must show "at least a *reasonable chance* to collect . . . . It is not enough to show that by a fortuitous combination of unlikely events there was a dim hope of collection." *Id.* at 655 (emphasis added). The court found that Marcoux failed to show that he would have a reasonable chance to collect if the return of the checks had been timely. *Id.* at 656. Consequently, the court ruled in favor of the bank. *Id.*

*Appliance Buyers* involves a fact pattern very similar to that found in *Marcoux.* Appliance Buyers sought to recover from Prospect National Bank the face value of two checks that were returned unpaid because of insufficient funds. Prospect National did not inform Appliance Buyers that the checks would be returned until six days after the bank discovered the insufficiency of funds; this delay violated Illinois' notice requirements. The drawer of the checks went bankrupt two days later. The Seventh Circuit held that, despite Prospect National's untimely notice, Appliance Buyers failed to demonstrate that it would have had a reasonable chance to collect the amounts owed him had notice been timely. At 294.

Union Bank also relies on *Whalen & Sons Grain Co. v. Missouri Delta Bank,* 496 F.Supp. 211 (E.D.Mo.1980), to support its position. In *Whalen & Sons,* too, the plaintiff sought to recover from a bank the face amount of checks returned because of insufficient funds. Again, the court required that the plaintiff show that he would have had a reasonable chance of collection if notice had been timely. *Id.* at 215. The court continued, "[t]he bank is not to be held liable for customer's debts

unless there is a clear causal relation between the bank's actions and the plaintiff's loss." *Id.*

Thus, to recover from a bank for the mishandling of a check, the claimant must show two things: first, that the bank mishandled the check, and, second, that the claimant would have had a reasonable chance of collecting the amount owed if not for the bank's mishandling.

Here, the government claims that Union Bank mishandled the check in that the bank failed to timely present the PFEL check to BankCal for payment. Whether or not Union Bank's presentment of the check was timely is a factual dispute to be resolved at trial. *See supra* Section IV C. Union Bank argues that, regardless of the resolution of this first issue, it is entitled to summary judgment because the government has presented no evidence establishing that there would have been a reasonable chance that BankCal would have honored the check and the government would have received its money but for Union Bank's mishandling of the check.

To support this argument, Union Bank relies on the deposition testimony of Jerry Schinkel, vice-president of BankCal. From mid-January through mid-February of 1978, Schinkel personally monitored the PFEL account, deciding which PFEL checks were to be paid. During this time, some PFEL checks were not paid because at the time the checks were presented some PFEL deposit checks had yet to be collected. If Union Bank received the PFEL check for taxes on January 27 and presented the check to BankCal for payment on January 30, as Union Bank contends, Schinkel testified that the check probably would not have been paid. But, if the check was received by Union Bank on January 25—as the government contends—and then presented to BankCal for payment on January 26 or 27, Schinkel testified that he did not know if the check would have been paid because he was unsure whether checks deposited on January 25 and 26, totalling $1,084,558, had been collected. From this testimony, Union Bank concludes

that the government cannot carry its burden of establishing that there was a reasonable chance that BankCal would have honored the check if it was presented for payment on January 26.

The government argues that Schinkel's testimony establishes that there was a reasonable chance that BankCal would have honored the check. Schinkel testified that he was unsure whether BankCal would have honored the check if it was presented on January 26 or 27. But, the government argues, between January 26 and January 31 BankCal honored over $2.2 million in PFEL checks. So, the government maintains that there was a reasonable chance the check would have been honored.

Unlike the situations in *Appliance Buyers*, at 293, and *Whalen & Sons*, 496 F.Supp. at 215, where the plaintiff offered *no* evidence that a reasonable chance of collection existed, the government has offered some evidence that there was a reasonable chance of collection. Also, unlike the situation in *Marcoux*, 572 F.2d at 655–56, the possibility that the government might collect is not based upon a series of events that were not likely to occur. Whether the government had a reasonable chance of collection depends upon the date on which Union Bank received the check. If received on January 27, it appears unlikely that the government would have been able to collect on the check; but if received on January 25, there was a reasonable chance that collection would have occurred. As discussed above, the evidence does not conclusively establish on which date Union received the check. In considering Union Bank's motion for summary judgment, the Court must draw all inferences in the favor of the non-moving party, the government here. Drawing the inference that Union Bank received the check on January 25, the Court finds that there is a reasonable chance that the check would have been honored if not for Union Bank's alleged mishandling of the check. Accordingly, the Court denies Union Bank's motion for summary judgment.

## V. Consolidation

The government moves that all three actions be consolidated for purposes of trial. The Court finds that judicial economy and the convenience of the litigants would be best served by consolidating *Alioto v. United States*, C–81–2143, and *United States v. Broude*, C–82–0475, and trying *United States v. Union Bank*, C–82–0919, separately.

At a status conference held on July 26, 1984, the Court set the following dates: September 1, 1984, for discovery cut-off; January 28, 1985, at 2 p.m. for pre-trial; and February 4, 1985, for trial.

IT IS SO ORDERED.