ESSEX CONSTRUCTION
CORPORATION

v.

INDUSTRIAL BANK OF WASHINGTON,
INC.

Civ. No. JFM–95–1981.

United States District Court,
D. Maryland.

Dec. 21, 1995.

Raymond G. LaPlaca, Reichelt, Nussbaum, LaPlaca & Miller, Greenbelt, MD, for plaintiff.

Vanessa Carpenter Lourie, Carpenter, Lourie & Berkowicz, Washington, DC, for defendant.

## MEMORANDUM

MOTZ, Chief Judge.

Plaintiff Essex Construction Corporation (Essex) claims violations of the Expedited Funds Availability Act and District of Columbia banking laws. Essex alleges that Defendant Industrial Bank of Washington, Inc. (Industrial) failed to make the proceeds of a deposited check permanently available for withdrawal on a promised date and that Industrial failed to provide timely notice that the check had been dishonored. Plaintiff seeks the amount of the check as damages. Defendant moves to dismiss or for summary judgment, and plaintiff cross-moves for default[1] or summary judgment.

## I.

The relevant facts are not in dispute. On March 31, 1995, plaintiff deposited into its account at Industrial a check in the amount of $120,710.70 from East Side Manor Cooperative Association (East Side). East Side's check was drawn against its account at Signet Bank (Signet). At the time of the deposit, Industrial provisionally credited Essex's account but provided written notice that all but $100 of the funds would not be available for withdrawal until April 6, 1995.

On April 6, Signet notified Industrial that East Side had stopped payment on the check. Industrial placed a permanent hold on the $120,710.70 deposit, effectively revoking the provisional credit to Essex's account. On April 7, Industrial mailed written notice (including the returned check itself) to Essex.

On April 7, Essex wrote two checks in the amount of $21,224.00 and $18,084.60 against the funds it thought were available in its account at Industrial. Essex received Industrial's written notice of dishonor on April 11.

## II.

The Expedited Funds Availability Act (EFAA), 12 U.S.C. §§ 4001 et seq., establishes specific time periods in which depository banks must make deposited funds available for withdrawal. For example, § 4002(b)(1) requires that deposited checks drawn against accounts at a local bank must be available not more than one business day after deposit. Section 4003(b)(1), however,

---

1. Plaintiff mailed a waiver of service request to defendant on July 11, 1995. Defendant agreed to waive service on July 18, 1995. The Federal Rules require a responsive pleading within 60 days after the date the waiver request is *sent.* Fed.R.Civ.P. 4(d)(3) *(emphasis added).* Even allowing 3 days for mailing, defendant's response was due on September 14, 1995. Defendant's response was not filed until September 18. This Court, however, has discretion to enter or set aside default judgments. *See* Fed.R.Civ.P. 55, 60. Here, defendant states that it simply misunderstood the rule, has filed subsequent papers in a timely fashion, and offers sound arguments on the merits. Plaintiff's motion for default judgment therefore is denied.

allows the creation by regulation of reasonable exceptions in cases of deposits that exceed $5000. 12 C.F.R. § 229.13(g) accordingly prescribes · the form and method of notice that a bank must employ to extend the time of availability of large deposits. Nothing in the record indicates that Industrial's notice on March 31 that the deposit would not be available until April 6 failed to comply with these requirements.[2]

■ Essex argues that it is entitled to recover because Industrial failed either to provide notice of dishonor or to make the funds available by April 6, the date specified in the notice it provided. Under 12 U.S.C. § 4006(b) the funds technically became available at the beginning of the April 6 business day. Thus, unless Industrial received notice from Signet before the start of business on April 6, Industrial could not have provided notice of dishonor prior to the time specified for funds availability. In fact, however, Industrial received the notice of stopped payment from Signet later in the day on April 6. Plaintiff's argument therefore amounts to a contention that a depositor's right to funds becomes absolute at the time a deposit is required to become available pursuant to the EFAA.

■ Plaintiff is correct that "[t]he purpose of the Expedited Funds Availability Act is to require banks to make funds available to depositors quickly. Thus, the depositor has rights, enforceable in court, while the banks have obligations." *First Ill. Bank & Trust v. Midwest Bank & Trust Co.,* 30 F.3d 64, 65 (7th Cir.1994), *cert. granted sub nom. Bank One Chicago, N.A. v. Midwest Bank & Trust Co.,* — U.S. ——, 115 S.Ct. 2607, 132 L.Ed.2d 852 (1995). The absolute entitlement plaintiff asserts is not, however, one of the rights provided to depositors under the Act. Section 4006(c)(2) expressly provides: "No provision of this chapter shall be con-

strued as affecting a depository institution's right ... (B) to revoke any provisional settlement made by the depository institution with respect to a check accepted by such institution for deposit; (C) to charge back the depositor's account for the amount of such check; or (D) to claim a refund of such provisional credit." Under § 4006(c)(2)(B), therefore, the EFAA placed no limit on Industrial's right under state law to revoke the provisional credit to Essex's account.[3] *See also* 12 U.S.C. § 4007(b) (preserving state provisions not inconsistent with EFAA). The EFAA requires that banks provide prompt access to valid deposits, not that banks assume liability for bad checks given to depositors. Plaintiff therefore is not entitled to relief under the EFAA.

### III.

■ Although the EFAA preserves a depository bank's right to revoke or charge back an uncollectible deposit, such action must comply with applicable state law. The District of Columbia has adopted the Uniform Commercial Code's system for regulating check processing transactions. The U.C.C. observes a fundamental distinction between "payor" and "collecting" banks. A payor bank is the bank maintaining the account against which a check is drawn, in this case Signet. *See* D.C.Code Ann. § 28:4-105(3). A collecting bank is a bank handling a check for collection from the payor, in this case Industrial. *See* D.C.Code Ann. § 28:4-105(5).

■ Payor and collecting banks have distinct obligations. A payor bank must decide whether to reject a check by midnight on the day it receives a check for collection. Failure to respond by midnight constitutes "final payment," making the payor bank strictly liable for the amount of the check.

---

2. Essex literally argues that "Industrial ... improperly provided this § 229.13(g) notice by providing an incorrect time period for the availability of funds and a time period that apparently could not be relied upon by the customer." Pl.'s Mot. at 8. Because Essex offers no evidence that Industrial knew or should have known that it would not receive notice of any problem with the deposit until after April 6, I interpret this as an argument that Industrial failed to comply with

the notice it gave, not that the notice itself was improper.

3. Indeed, even had Essex temporarily accessed the funds on early in the day on April 6, § 4006(c)(2)(C) would have preserved Industrial's ability under state law to charge back the amount of the deposit.

*See First Nat'l Bank in Harvey v. Colonial Bank,* 898 F.Supp. 1220, 1226 (N.D.Ill.1995) (discussing U.C.C.'s "final payment" system and role of payor banks); *see also* D.C.Code Ann. § 28:4–302(a). A collecting bank, in contrast, retains the right to revoke or charge back funds that are provisionally credited to a customer until the collecting bank's settlement with the payor bank becomes final. *See* D.C.Code Ann. § 28:4–214(a). It is at the moment of "final payment" by the payor bank that the respective liabilities for a check become fixed: the payor bank is strictly liable to the collecting bank for the amount of the check, *see* D.C.Code Ann. § 28:4–302(a), and the collecting bank loses the ability to revoke a provisional settlement or charge back withdrawn funds. *See* D.C.Code Ann. §§ 28:4–215(d), 28:4–214(a).

### A.

 Essex argues that on April 6 Industrial's provisional credit to its account became a final and irrevocable payment under D.C.Code Ann. § 28:4–215(a). This contention misunderstands the difference between payor and collecting banks. As discussed, a final payment occurs when a payor bank accepts or fails to promptly reject a check presented for collection by a collecting bank. Industrial was the collecting bank in this transaction. Essex's reliance on § 28:4–215(a) therefore is misplaced. *See* D.C.Code Ann. § 28:4–215(a) ("An item is finally paid by a *payor* bank when the bank has first done any of the following....") (emphasis added). Essex's right to the provisionally credited funds became irrevocable only upon "final payment" by Signet to Industrial, a condition that Essex does not allege occurred.

### B.

 Essex also argues that Industrial's mailing of the returned check via first class mail on April 7 did not constitute timely notice of dishonor under D.C. law. D.C.Code Ann. § 28:4–214 provides in relevant part:

§ 28:4–214 Right of charge-back or refund; liability of collecting bank; return of item. (a) If a collecting bank has made a provisional settlement with its customer for an item and fails by reason of dishonor ... to receive settlement for the item which is or becomes final, the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account, or obtain refund from its customer ... if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts....

....

There is no dispute that Industrial failed by reason of dishonor to receive a final payment from Signet, the payor bank. Section 28:4–214(a) therefore provides that Industrial could revoke the provisional credit "if by its midnight deadline or within a longer reasonable time after it learn[ed] the facts it return[ed] the item or sen[t] notification of the facts." A bank's "midnight deadline" is defined as "midnight on its next banking day following the banking day on which it receives the relevant item or notice." D.C.Code Ann. § 28:4–104(a)(10); *see also* D.C.Code Ann. § 28:3–503(c)(i) ("[W]ith respect to an instrument taken for collection by a collecting bank, notice of dishonor must be given by the bank before midnight of the next banking day following the banking day on which the bank receives notice of dishonor of the instrument."). The parties do not dispute that Industrial received notice of dishonor from Signet on April 6, that Industrial mailed the returned check to Essex before midnight on April 7 via first class mail, but that Essex did not receive it until April 11.

Essex argues that merely mailing the notice of dishonor before midnight on April 7 was insufficient. Industrial attempts to rely on 28:3–508(4) for the proposition that "[w]ritten notice is given when sent although it is not received." However, the District of Columbia Council repealed 28:3–508 effective March 27, 1995. *See* An Act to revise Articles 3 and 4 of the Uniform Commercial Code, 1994 D.C.Laws 10–249. Industrial's position finds alternative support, however, in § 28:4–214. Section 28:4–214(a) requires a bank to "*send* notification of the facts" or "*return*" the dishonored item. (emphasis added). Section 28:4–214(b) defines an item as "returned" "when it is *sent* or delivered to

the bank's customer." In addition, § 28:3–503(b) provides that notice of dishonor may be given by "any commercially reasonable means, including an oral, written, or electronic communication." Industrial did not unduly delay notifying Essex, but instead took the reasonable step of promptly mailing the returned check. Although immediately telephoning Essex may have constituted better customer service, Industrial complied with D.C. notice requirements by mailing the returned check to Essex on April 7.

█ Moreover, even were I to find that Industrial's method of notice was not sufficient, Essex would not be entitled to the damages it seeks. In a case involving directly analogous provisions of the U.C.C. as enacted in Illinois, the Seventh Circuit has held that a depositor is entitled only to the damages actually resulting from a bank's failure to provide timely notice of dishonor. *See Appliance Buyers Credit Corp. v. Prospect Nat'l Bank*, 708 F.2d 290, 292–95 (7th Cir. 1983). Furthermore, although the *Appliance Buyers* court reached this well-reasoned conclusion by interpreting an Illinois statute that was silent as to damages,[4] here the D.C. provision contains additional language which expressly so limits a depositor's remedies: a bank that fails to provide timely notice retains its right to charge back dishonored deposits "but is liable for any loss *resulting from the delay.*" D.C.Code Ann. § 28:4–214(a) (emphasis added).[5] Plaintiff therefore may have been able to assert a claim for the bank charges associated with the two checks written on April 7, or for other foreseeable damages.[6] Essex, however, has made no showing of damages actually suffered.

## IV.

A separate order granting defendant's summary judgment motion and entering judgment on its behalf is being entered herewith.

---

4. In *Appliance Buyers*, the Seventh Circuit noted that because the charge-back provision at issue in that case did not expressly address damages—in contrast to other U.C.C. provisions that expressly do hold banks "accountable" for the amount of the check—the drafters could not have intended "that banks should be held strictly liable for the face value of dishonored checks." 708 F.2d at 293. Instead, the *Appliance Buyers* court turned to Illinois' general damages provision, which provided only for actual damages and which was identical to D.C.'s current provision. *Compare* D.C.Code Ann. § 28:4–103(c) *with* 708 F.2d at 293 (quoting Ill.Rev.Stat. ch. 26 § 4–103(5)).

5. In fact, prior to revisions that became effective on March 27, 1995, the predecessor to D.C.Code Ann. § 28:4–214(a) was largely identical to the Illinois statute at issue in *Appliance Buyers*. In 1995, however, the D.C. Council revised its U.C.C. provisions to add, among other changes, the above-quoted language that expressly limits recovery to actual loss. *See* 1994 D.C.Laws 10–249.

6. To recover the $120,710.70 from Industrial, therefore, Essex would have had to show that, absent the delay from April 7 to April 11, it would have been able to take action to collect from East Side. *See Alioto v. United States*, 593 F.Supp. 1402, 1416–17 (N.D.Ill.1984) (discussing cases). The record indicates, however, that East Side stopped payment on the check because of its ongoing dispute with Essex, not that East Side lacked funds on April 11 (or any time thereafter) that it had on April 7. In addition, defendant points out that in a separate proceeding East Side has alleged that it directly informed Essex of the stop payment order on April 6, the same day Signet notified Industrial. *See* Def.'s Reply, Ex. 2 at 19.