**In re Sandra and Samuel SAWYER, Debtors.**

**Bankruptcy No. 04–01279–PHX–SSC. Adversary No. 04–00838.**

United States Bankruptcy Court, D. Arizona.

March 30, 2005.

116

Barton L. Baker, Yuma, AZ, for Debtors.

## MEMORANDUM DECISION

SARAH SHARER CURLEY, Chief Judge.

### I. Preliminary Statement

On May 18, 2004, Jill Ford, the Chapter 7 Trustee in this case, filed a Motion to Compel Turnover by the Debtors of Estate Property. The Debtors, acting pro se, filed an initial pleading objecting to the relief requested. Because of the unique issues presented by the Trustee, the Court set up a further briefing schedule and conducted several hearings on the matter. The Court has now set forth its decision on the matter. This constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Bankr.P. 7052. This is a core proceeding over which this Court has jurisdiction. 28 U.S.C. §§ 1334 and 157. (West 2004)

## II. Factual Discussion

The Debtors filed a voluntary Chapter 7 petition under the Bankruptcy Code on January 27, 2004.[1] At the time that they filed their petition, they maintained an account at Wells Fargo Bank Arizona, N.A. ("Wells Fargo"). At the time of oral argument on the Trustee's Motion, the Trustee presented a chart, which the Debtors did not contest, but which was not admitted as an exhibit, which reflected the Debtors' having written certain checks pre-petition which cleared the Wells Fargo Account post-petition. The Trustee's counsel was unclear whether the checks had been mailed pre-petition or post-petition, but stated that it did not matter. The Debtors asserted at the time of oral argument that Ms. Sawyer had been ill, and when she had received certain income pre-petition, she wrote the checks and sent them by mail. It was the Debtors' position that they had defrauded no one and had simply written and sent the checks pre-petition in the ordinary course.

The Trustee also presented, but did not admit, the check register of the Debtors for the time period from January 20, 2004 through February 2, 2004 ("Register"). The Debtors did not dispute that the Register was a portion of their check register. The Register reflects that the Debtors had a balance on hand of $1,057.62 on or about January 20, 2004. One or both of the Debtors apparently wrote a number of checks in the Register until January 22, 2004, when the Register reflected a balance on hand of $9.16. On that date, in the margin, there was a notation that subsequent checks "would be mailed after the deposit." A number of checks were set forth in the Register after that date with the balances in parentheses. A series of deposits were reflected in the Register

around January 26, 2004. One or both of the Debtors continued to write checks, as reflected in the Register, until the balance of funds was reduced to zero.

Finally, the Trustee also presented, without objection, Page 3 from the Debtors' Wells Fargo bank account statement for the period January 24, 2004 through February 23, 2004 ("Bank Statement"). The Bank Statement set forth a number of checks, the "date" of the checks, and the amount of each check. The aggregate amount of all checks that were reflected on Page 3 was the sum of $8,712.70. The Bank Statement also reflected a number of "Other Withdrawals" by the Debtors, such a "Paypal Transfers," direct debits by various merchants, and a number of "check card" purchases. It is unclear whether all of the "Other Withdrawals" have been shown, and there is no aggregate balance for these other transactions.

The Trustee's Memorandum of Law also stated that the Trustee was seeking the turnover by the Debtors of the net sum of $5,082.34, which was the alleged non-exempt portion of the funds on deposit in the Debtors' account. The Trustee was willing to allow the Debtors an exemption of $300, as provided under Arizona law, for the funds in the account on the date of the commencement of Debtors' case, but the net amount of $5,082.34 was to be turned over to the Trustee for administration.

The Trustee did not call anyone from Wells Fargo to testify as to the Account, did not present the complete Bank Statement, and presented only the Bank Statement concerning when the various checks written by the Debtors on their Account actually cleared the Wells Fargo Account. The Debtors did not present any evidence in support of their position.

---

1. All references in this Decision are to the Bankruptcy Reform Act of 1978, as amended, unless otherwise stated. 11 U.S.C. §§ 101–1330.

The Court's review of the partial records presented does provide some information that has not been explained. For instance, the Debtors appear to have kept a meticulous record of their transactions in their Register. It appears that around January 20, 2004, the Debtors had collected funds in their Wells Fargo Account in the amount of $1,057.62. The Debtors proceeded to write a number checks or to have direct debits by merchants to their account, in the ordinary course, until January 22, 2004, when they had only $9.16, according to their records, in the Wells Fargo Account. The Debtors' Register reflects that the Debtors then recorded a number of checks being written, reflecting a negative balance on their check register, with a notation to "mail after deposit." The Debtors' Register then reflects that on January 26, 2004, the Debtors made four separate deposits into the Wells Fargo Account; that is, the amounts of $1,142.67, $169.30, $2,500, and $1,100.[2] Once the deposits were made, the Debtors reflected positive balances in their Register. They continued to write checks on January 26 and January 27, 2004, the date that they filed their bankruptcy petition. They made another deposit, according to the Register, on January 29, 2004, in the amount of $95.68, and they continued to write checks on January 31 and February 2, 2004 until they once again had a negative balance.

Page 3 of the Debtors' Bank Statement reflects numerous checks written from January 26, 2004, through February 23, 2004, in the aggregate amount of $8,712.70. The Page also reflects numerous other withdrawals from the Account through the mechanism of direct debits by merchants or a similar method of payment.[3] No deposits are reflected on this Page.

There is nothing in the record to reflect that the Debtors were acting in bad faith or with fraudulent intent. They simply seemed to be depositing funds, allowing debits from their Account by merchants, and writing checks in the ordinary course.

### III. Issue Presented

Whether the Trustee may require the Debtors to turn over the net sum of $5,082.34 pursuant to Section 542 of the Bankruptcy Code.[4]

### IV. Discussion

#### A. The Evidentiary Requirement

As the movant, the Trustee carries the burden of proof on her Motion for Turnover. To the extent that the record is incomplete or does not address certain evidentiary issues, the Court must hold the Trustee responsible.

The Court cannot conclude that the net sum of $5,082.34 should be turned over

2. The Debtors' Schedules filed with the Court reflect that at the time of the filing, both Debtors were unemployed. However, the Debtors did state at oral argument that they received deposits pre-petition and shortly after the petition was filed. It is unclear to the Court as to whether the deposits were from the operation of a business. *See* Docket Entry No. 8, Debtors' Statements, Schedules I and J thereto.

3. The Bank Statement also reflects a transfer through "Paypal," a service which apparently allows the Debtors to use funds from their

Account to be transferred immediately to the account of the merchant or individual which also subscribes to the service. The Debtors also purchased a series of "check cards."

4. The Trustee also requested relief under Section 549 of the Bankruptcy Code. Since the Trustee is entitled to the relief requested under Section 542 of the Code, provided that certain evidentiary issues are resolved, the Court need not address the distinct factual and legal issues that would be raised under Section 549.

by the Debtors. The Trustee has presented some information, which has not been contested by the Debtors, as to what the collected funds were in the Debtors' Wells Fargo Account on the date that they filed their bankruptcy petition. However, if the Court reviews the Trustee's chart as to, for instance, Check No. 2367, the Trustee asserts that it was dated January 22, 2004 and that it cleared the Wells Fargo Account on February 2, 2004. If the Court reviews Page 3 of the Bank Statement, it reflects withdrawals by check numbers and has under the heading "Date," the notation "2/2." The Trustee apparently wants the Court to surmise that Check No. 2367 was honored by Wells Fargo on February 2, 2004, but there is certainly no evidentiary support, from a bank officer or other appropriate witness with personal knowledge, for that conclusion. Moreover, the Trustee did not call the Debtors to testify before the Court on these points. The gap in the evidentiary support is true as to the other transactions that the Trustee questions. Although the Debtors did not necessarily dispute when the various checks were honored by Wells Fargo, the Court was presented with an incomplete record as to what transpired. Based upon the Trustee's failure to present sufficient evidence in support of the specific relief requested, the Court must set a further hearing on this matter. However, the Court recognizes that once these evidentiary issues are addressed, the Trustee will be entitled to a turnover of the Debtor's collected funds in their Wells Fargo account on the date that they filed their bankruptcy petition.

### B. *The Overlay of Federal and State Law*

The Debtors represented, at the time that they filed their petition, that they were unemployed. However, at oral argument, they related that they had previously owned and operated a construction company. Ms. Sawyer also described that as she received "commissions," they were deposited into the Account at Wells Fargo. Certainly, since the Debtors resided in Arizona and maintained their Account in this State, Arizona's law governing commercial transactions would be applicable, at least in part, to resolving this dispute. *See* A.R.S. § 47–1102(b)(1) (2004).[5]

In determining the nature of the transactions between the Debtors and Wells Fargo, the Uniform Commercial Code, as well as the law of contracts—or the bargain of the parties would be important in any decision of this Court. *See* A.R.S. § 47–1201(3) (2004).[6]

Since the Debtors maintained a pre– and post-petition Account at Wells Fargo, a national banking association, Article 4 and 4A of the Uniform Commercial Code deal primarily with deposits and their availability. However, Article 3, which pertains to negotiable instruments, may also be relevant to any inquiry. If there is a conflict between the Articles, Article 4 controls over Article 3. *See* U.C.C. § 4–102(a) (2004). Articles 4, 4A, and 3 have been adopted in Arizona. *See* A.R.S. § 47–3101 and § 47–4101 *et. seq* (2004).

Title 12 of the United States Code also governs the relationship of the banking institution with the depositor and other parties. State law provisions are pre-

---

**5.** The Uniform Commercial Code supplies and provides guidance at to commercial transactions. Also see A.R.S. § 47–1103, Comment 1, which states that all supplemental bodies of law, federal or state, are applicable in commercial contracts.

**6.** Also see A.R.S. § 47–4103(A), stating that the provisions of the Uniform Commercial Code may be varied by the agreement of the parties.

served and may resolve a dispute before the Court, so long as they are not inconsistent with federal law. *Essex Construction Corporation v. Industrial Bank of Washington, Inc.*, 913 F.Supp. 416, 418 (D.Md. 1995).

Under Article 4 of the Uniform Commercial Code, when the Debtors deposited their funds with Wells Fargo, Wells Fargo made a concomitant promise to return those funds to the Debtors upon demand. In essence, the deposit account became a liability of the Bank. As deposits were placed in the Debtors' Account, Wells Fargo was required, by federal law, to provide prompt access to the Debtors' valid funds.[7] However, federal law did not require that Wells Fargo assume liability for "bad checks" given to depositors such as the Debtors. *Id.* at 418. Wells Fargo was permitted to provide the Debtors with a provisional credit or "settlement" for any deposit made by the Debtors to their account. *See* U.C.C. § 4–201(a); A.R.S. § 47–4201(A) (2004). This provisional credit or settlement would not have violated federal law[8] and would have initially increased the balance in the Debtor's Account. In turn, the Debtors' creditors, after receipt of the Debtors' checks would have placed those checks in their respective accounts, receiving a provisional credit and placing the check in the Federal Reserve System for collection. The Debtors'

Bank would be processing the checks as the "payor bank," and the creditors' banks would have been the "collecting" banks. *See* U.C.C. § 4–105, Subsections 3 and 5; A.R.S. § 47–4105 (2004). The Debtors' Bank must determine whether to reject any check presented to it for payment by midnight on the day that it receives it for collection. *See* U.C.C. § 4–302(a); A.R.S. § 47–4302(A)(1) (2004). In turn, the collecting banks, or those acting on behalf of the creditors, would retain the right to revoke or charge back the funds that were provisionally credited to a customer's or creditor's account until the collecting banks' settlement with the payor bank became final.

The Debtors paid their creditors through a variety of methods. One of those methods was the utilization of a personal check. If we review the definition of a negotiable instrument under Uniform Code Section 3–104 and/or Arizona Revised Statute Section 47–3104, it is clear that the checks utilized by the Debtors were negotiable instruments.[9] Of importance to our analysis is the fact that a negotiable instrument includes an "unconditional promise to pay." In this case, the Debtors presented checks to their creditors with such an unconditional promise to pay.

---

7. The Expedited Funds Availability Act, 12 U.S.C. §§ 4001, *et seq.*, requires that depository banks provide, pursuant to specific time periods, depository funds available for withdrawal.

8. 12 U.S.C. § 4006(c)(2).

9. Section 3–104 and A.R.S. § 47–3104, outline the requirements of a negotiable instrument as: "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it: (1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder; (2) is payable on demand or at a definite time; and (3) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor." U.C.C. § 3–104 (2004); A.R.S. § 47–3104 (2004).

As noted previously, Article 4 of the Uniform Commercial Code controls over Article 3 to the extent that there is any inconsistency. Therefore, the Debtors' unconditional promise to pay, as set forth on the face of their checks, was vitiated by the requirement that the collecting banks need only give provisional credit to their depositors, the Debtors' creditors, until the payment from the Debtors' payor bank became final.

Given this overview, on the date that the Debtors' filed their petition, the Court concludes that the Debtors still controlled the funds in their Account as to which they had already written numerous checks. The creditors' banks would have been providing the creditors only provisional credits for any deposits, waiting for the Debtors' payor bank to advise them whether there were sufficient funds on hand to make the payment final as to the Debtors' checks.

### C. *The Bankruptcy Code Provisions*

In analyzing § 362(b)(11), which states that the automatic stay does not apply to the presentment of a negotiable instrument, such as a check, and the giving of notice of dishonor of such instrument,[10] and 11 U.S.C. § 542(c), which provides that an entity, such as a financial institution, which has neither actual notice nor knowledge of the commencement of a debtor's case, may transfer property of the estate or pay a "debt owing to the debtor, in good faith" to a person or entity other than the trustee as if the debtor's case had never been filed,[11] the Court discerns a Congressional policy that certain routine transactions in commerce, whether pertaining to an individual debtor or a large corporate entity as a debtor, will not be disrupted, particularly if the entity engaged in the potential transfer of bankruptcy estate property has no actual notice or knowledge of the debtor's having commenced a bankruptcy proceeding. This protection, however, appears to apply only to those third parties which engage in transactions with the debtor.

■ Indeed, a review of Section 541 provides that the collected funds in the Debtor's account became property of the bankruptcy estate either pursuant to Section 541(a)(1) or (a)(2). Section 541(a)(1) provides "the commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held (1) except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case." The scope of this Subsection is broad. *Cusano v. Klein*, 264 F.3d 936 (9th Cir.2001); *Chappel v. Proctor*, 189 B.R. 489 (9th Cir.

---

**10.** 11 U.S.C. § 362(b)(11) provides, in pertinent part:

The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay—

. . . .

(11) under subsection (a) of this section, of the presentment of a negotiable instrument and the giving of notice of and protesting dishonor of such an instrument.

**11.** 11 U.S.C. § 542(c) states, in pertinent part:

Except as provided in section 362(a)(7) of this title, an entity that has neither actual notice nor actual knowledge of the commencement of the case concerning the debtor may transfer property of the estate, or pay a debt owing to the debtor, in good faith and other than in the manner specified in subsection (d) of this section, to an entity other than the trustee, with the same effect as to the entity making such transfer or payment as if the case under this title concerning the debtor had not been commenced.

BAP 1995); *In re Morris,* 154 B.R. 556 (Bankr.D.Ariz.1993).[12]

Subsection 541(a)(2) may provide a separate basis for the Wells Fargo Account to become property of the estate, since that Subsection refers to community property in which the debtor and debtor's spouse have an interest, yet the debtor has "sole, equal, or joint management and control" of the Account.[13] In this case, both Debtors filed their bankruptcy petition, but at least at oral argument, Ms. Sawyer seemed to have the primary control over the Wells Fargo Account. The fact that she had such control, however, would not preclude the Account from becoming property of the estate.

 As to whether the Debtors must turnover any funds to the Trustee, Section 542(a) states in relevant part:

[A]n entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee such property or the value of such property . . .

The Court's review of the term "entity" certainly encompasses the Debtors. 11 U.S.C. § 101, subsection 15 and 41 (2004). As noted previously, either Section 541(a)(1) or (a)(2)(A) would incorporate the Debtors' interest in the Wells Fargo Account as property of the estate.[14] However, to succeed under Section 542, the Trustee must show that the Debtors had "possession, custody, or control" of the Account on the date that they filed their petition. The Trustee argues that the Debtors had the sum of $5,082.34 in net collected funds in their Wells Fargo Account on the date that they filed, not subject to any claim of exemption, and that the Debtors must turn over all of these funds, although the Debtors had issued checks on the Account which cleared Wells Fargo post-petition. The Trustee believes that because the Debtors could have placed "stop payment" orders on all of the checks, they had the requisite possession or control for purposes of the turnover proceeding.

The two only reported decisions which appear to address squarely the issues presented by the Trustee herein come to far different results. Neither decision is from

---

12. The Legislative History for this Subsection also states this provision includes property "recovered by the trustee under section 542 of proposed title 11, if the property recovered was merely out of the possession of the debtor, yet remained 'property of the debtor'." H.R. 595, 95th Cong. (1977); S.Rep No. 989, 95th Cong. (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5868, 5963, 6323.

13. Section 541(a)(2) provides in its entirety:

The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

. . . . .

(2) All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is—

(A) under the sole, equal, or joint management and control of the debtor; or
(B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.

14. The Debtors do not dispute that their funds were placed into the Wells Fargo Account and that at least Ms. Sawyer had management or control over the funds deposited. Since the Debtors are married, there is a presumption under Arizona law that the funds placed into the Account constituted the community property of the Debtors. *Carroll v. Lee,* 148 Ariz. 10, 712 P.2d 923 (Ariz.1986); *Blazek v. Superior Court In and For County of Maricopa,* 177 Ariz. 535, 539, 869 P.2d 509, 513 (Ariz.App. Div. 1 1994). Thus, Section 541(a)(2)(A) appears applicable to the account.

a court in the Ninth Circuit. In the decision of *In re Figueira,* 163 B.R. 192 (Bankr.D.Kan.1993), the trustee filed a motion for the turnover of funds in the debtor's bank account as of the date of the filing of the bankruptcy petition. The debtor had listed the bank account on his schedules, but had listed a balance of zero in the account. Upon investigation, the trustee discovered that the debtor had a balance of $1,055.13 on hand, if the trustee included those checks which had been written pre-petition by the debtor, but had been honored post-petition by the debtor's bank. The trustee pursued the debtor because none of the creditors received more than an aggregate amount of $600 in payment, so the trustee would not have succeeded on any claim under Section 547.[15]

The Court analyzed the nature of the debtor's interest in the account and determined that the debtor was simply owed a debt by his financial institution and that there was no requirement that the debtor assist the trustee with the collection of a debt owed to the estate. *Id.* at 194. The debtor need only surrender the property in his possession, and the account did not qualify as such property. *Id.* The Court also stated that Fed.R.Bankr.P.2015(a)(4) required the trustee to provide notice to the financial institutions of the filing of the debtor's case, which supported the Court's conclusion that the trustee was required to secure the account at the time of the filing of the case and pursue the bank or creditor which received property of the estate.

This Court must disagree with this analysis. Although this Court has an enormous amount of sympathy for the pro se Debtors in this case who apparently acted in good faith, the Court cannot disregard those provisions of federal and state law which provide, at a minimum, (1) that the Debtors' interest in the Wells Fargo Account became property of the bankruptcy estate when they filed their petition, and (2) that although the Debtors may not have had technical custody of those funds as to which they had written checks to their creditors, they did have control over the funds, because Wells Fargo had not authorized, as a payor bank, any final payment on the checks that the Debtors had sent out by mail. Even the direct payment to merchants or similar transactions had an apparent delay before they became final. However, the Trustee must clarify exactly what were the collected funds in the Debtors" Account when they filed their petition through further evidentiary support. Section 541 offers no exception for the predicament of these Debtors, although Congress clearly could have carved out an exception as to what constituted property of the estate. Finally, Section 542 is overly broad, so that there is no basis for this Court to exclude the Debtors from the operation of its turnover provisions. Indeed Fed.Bankr.R.P. 7001 specifically permits the trustee to request the turnover of property over which the debtor has possession or control by simple motion.

The other reported decision supports the conclusion that this Court has reached. In the decision of *In re Maurer,* 140 B.R. 744 (D.Minn.1992), the District Court, on appeal, affirmed the conclusion of the bankruptcy court that the debtor must turn over the funds that were in his account on the date that he filed even though the debtor had delivered three checks to his creditors pre-petition, which were not honored by the debtor's bank until after

**15.** 11 U.S.C. § 547(c)(8) specifically prohibits the trustee from avoiding a transfer if an individual debtor files the bankruptcy petition, the debts are primarily consumer debts, and the aggregate of all property affected by such a transfer to a creditor is less than $600.

the debtor had filed his petition. Upon a review of the debtor's account, the trustee discovered that the debtor had $1,083.11 on deposit when he filed his petition. Subsequently, three checks were honored post-petition by the debtor's bank, leaving the debtor with a balance of $43.21. *Id.* at 745. The Appellate Court first analyzed the Supreme Court decision of *Barnhill v. Johnson,* 503 U.S. 393, 112 S.Ct. 1386, 1390, 118 L.Ed.2d 39 (1992), wherein the Supreme Court determined that, at least for purposes of Section 547(b), the transfer occurred only when the debtor directed his bank to honor the check, and the bank, in fact, did so. *Id.* at 745. Acknowledging that the Eighth Circuit had not yet taken a position on the issue under Section 542, and that the Courts had different interpretations as to whether the date of the delivery of the check or the date that the check was honored should control, depending on the Subsection or Section being analyzed,[16] the Court in *Maurer* determined that the policy issue required that there be an equitable distribution to creditors, and that policy was best effectuated by determining that the funds remained in the estate until the debtor's bank honored the check. *Id.* at 746. Such an analysis makes sense in that until the checks were honored by the debtor's bank, the debtor still had the opportunity to close the account or to stop payment on the checks.

The Court concludes that although it is unfortunate that there are now different standards as to when a transfer occurs when analyzing what is an avoidable transfer, the current case law requires such a result.

### V. Conclusion

Although it concerns this Court that this Decision now requires a debtor in Arizona

to wait until all checks have been honored, or all direct debits to his/her account have been completed, before filing a petition, or risk the trustee requiring a turnover of the collected funds that are on deposit in the debtor's account at the time of filing, the Court sees no alternative to such a requirement. Unfortunately, many debtors do not have the luxury to wait while all checks are being honored. In essence, the debtor is now required to use his/her debit card before filing, note the collected funds in the account, and then place that amount on the debtor's schedules.

Because the Trustee did not fully support the collected funds in the Debtors' Account at the time that they filed their bankruptcy petition, the Court will set a further hearing on this matter by separate notice. The Court will execute a separate order as well, incorporating this memorandum decision.

---

16. For purposes of Section 547(c), the Court noted that the Eighth Circuit had relied on the date of the delivery of the check as being the operative date, but had determined that the date of payment was the applicable date for purposes of Section 547(b). *Id.* at 746.